301 Ga. 408
FINAL COPY

S17A0196. LATHROP et al. v. DEAL et al.

BLACKWELL, Justice.

Simply put, the constitutional doctrine of sovereign immunity forbids our courts to entertain a lawsuit against the State without its consent. In Georgia Dept. of Natural Resources v. Center for a Sustainable Coast, 294 Ga. 593, 602 (2) (755 SE2d 184) (2014), we held that the doctrine extends to suits for injunctive relief, and in Olvera v. Univ. System of Ga. Board of Regents, 298 Ga. 425, 428 n.4 (782 SE2d 436) (2016), we held that it likewise extends to suits for declaratory relief. But those decisions involved no constitutional claims, and since Sustainable Coast, we have not had occasion to consider whether the doctrine of sovereign immunity extends to claims for injunctive or declaratory relief that rest upon constitutional grounds. See State of Ga. v. Intl. Keystone Knights of the Ku Klux Klan, 299 Ga. 392, 395 (1) n.11 (788 SE2d 455) (2016). In this case, we are confronted squarely with that question. We hold today that the doctrine of sovereign immunity extends generally to suits

against the State, its departments and agencies, and its officers in their official capacities for injunctive and declaratory relief from official acts that are alleged to be unconstitutional. In so holding, however, we recognize the availability of other means by which aggrieved citizens may obtain relief from unconstitutional acts, including prospective relief from the threatened enforcement of unconstitutional laws.

## I.

This case began in 2012, not long after the adoption of House Bill 954,[1] which concerns medical procedures for the termination of pregnancies. Among other things, House Bill 954 requires a physician in most circumstances to ascertain the "probable gestational age of the unborn child" before performing an abortion,[2] see Ga. L. 2012, p. 575, § 3 (codified at OCGA § 31-9B-2), and it forbids a physician to perform an abortion when the probable gestational age has been determined to be 20 weeks or more, unless the pregnancy is "medically

---

[1] See Ga. L. 2012, p. 575. The General Assembly enacted House Bill 954 at its 2012 Session, and the Governor approved the legislation on May 1, 2012.

[2] The "probable gestational age" need not be ascertained in a "medical emergency" or when a pregnancy has been determined to be "medically futile." Ga. L. 2012, p. 575, § 3 (codified at OCGA § 31-9B-2). House Bill 954 expressly defines all of these terms. See Ga. L. 2012, p. 575, § 3 (codified at OCGA § 31-9B-1).

2

futile" or the abortion is necessary to "[a]vert the death of the pregnant woman," "avert [a] serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman," or "[p]reserve the life of an unborn child." See Ga. L. 2012, p. 575, § 2 (codified at OCGA § 16-12-141 (c) (1)). In the limited circumstances in which an abortion is permissible notwithstanding a determination that the probable gestational age is 20 weeks or more, a physician must perform the abortion by means that offer "the best opportunity for the unborn child to survive," unless those means would pose an increased risk to the woman undergoing the procedure of "death [or] substantial and irreversible physical impairment of a major bodily function." See Ga. L. 2012, p. 575, § 2 (codified at OCGA § 16-12-141 (c) (2)). House Bill 954 provides that, after an abortion or attempted abortion, a physician must file a report of the procedure with the Department of Public Health, see Ga. L. 2012, p. 575, § 3 (codified at OCGA § 31-9B-3 (a)), and it preserves preexisting law that makes hospital and licensed health facility records concerning abortion procedures available to a district attorney.[3] See Ga. L. 2012, p. 575, § 2

_____

[3] This preexisting provision has been a part of our statutory law since 1973. See Ga. L. 1973, p. 635, § 1.

3

(codified at OCGA § 16-12-141 (d)). Except as permitted by statutory law (including House Bill 954), the performance of an abortion is a felony. See Ga. L. 2012, p. 575, § 2 (codified at OCGA § 16-12-140).

Eva Lathrop, Carrie Cwiak, and Lisa Haddad are physicians licensed to practice in Georgia. They practice in the fields of obstetrics and gynecology, and as a part of their practice, they sometimes perform abortions. In November 2012, just weeks before House Bill 954 became generally effective,[4] they filed a petition in the Superior Court of Fulton County against Governor Nathan Deal and nineteen other state officers in their official capacities.[5] In their petition, the plaintiff-physicians alleged that House Bill 954 violates the state Constitution in several respects.[6] First, they said, the limitations of the circumstances in

---

[4] For the most part, House Bill 954 became effective on January 1, 2013. It was effective sooner for the limited purpose of "promulgating rules and regulations" pursuant to its provisions. See Ga. L. 2012, p. 575, § 6.

[5] More specifically, the plaintiff-physicians filed their petition against the Governor, the Attorney General, the district attorneys for Fulton and DeKalb Counties, the Commissioner of Public Health, fourteen members of the Georgia Composite Medical Board, and the executive director of the Georgia Composite Medical Board, all in their official capacities.

[6] The plaintiff-physicians did not press any claim that House Bill 954 violates the United States Constitution. They instead relied solely upon the state Constitution. Although the United States Supreme Court has held that the national Constitution limits the extent to which the government may deny or impair the freedom of a woman to choose to abort her pregnancy, see Whole Woman's Health v. Hellerstedt, ___ U. S. ___, ___ (III) (136 SCt

4

which an abortion may be performed and the means by which certain abortions may be performed violate their patients' constitutional right of privacy, as guaranteed by the Due Process Clause of the Constitution of 1983 (Art. I, Sec. I, Par. I), the Freedom of Conscience Clause (Art. I, Sec. I, Par. III), and the Inherent Rights Clause (Art. I, Sec. I, Par. XXIX). Second, the preservation of preexisting law that makes abortion records accessible by a district attorney, they alleged, violates their patients' right of privacy, as well as the Equal Protection Clause of the Constitution of 1983 (Art. I, Sec. I, Par. II). Finally, House Bill 954 violates the Due Process Clause, they claimed, because it attaches criminal penalties to violations of statutory requirements that are vague and uncertain. Based on these allegations, the plaintiff-physicians sought a declaratory judgment that certain provisions of House Bill 954 are unconstitutional, and they sought injunctive relief to restrain the defendant-state officers from enforcing House Bill 954.

---

2292, 195 LE2d 665) (2016), this Court never has held that the state Constitution imposes similar limits upon the regulation of abortions, and we have no need to decide that question in this case. For the purpose of deciding this appeal involving questions about sovereign immunity (and *only* for that purpose), we will assume that the Constitution of 1983 limits the extent to which the State may restrict the performance of abortion procedures as alleged by the plaintiff-physicians.

For the next year or so, the parties litigated various issues relating to the merits of the petition.[7] Then, in February 2014, we issued our decision in Sustainable Coast. Soon thereafter, the defendant-state officers filed a motion to dismiss, asserting that the claims against them in their official capacities for declaratory and injunctive relief amount to claims against the State itself, and under Sustainable Coast, those claims are barred by the doctrine of sovereign immunity. The plaintiff-physicians responded that Sustainable Coast did not involve constitutional claims, and they urged that claims for declaratory and injunctive relief from state action that is alleged to be unconstitutional are not barred by sovereign immunity. In October 2015, the trial court granted the motion to dismiss, and the plaintiff-physicians appeal from the dismissal of their petition.[8]

---

[7] Among other things, the trial court entered an interlocutory injunction to restrain the enforcement of House Bill 954 to the extent that it limits abortions of pregnancies prior to the point of viability.

[8] The appeal was docketed in this Court for the term beginning in December 2016. The plaintiff-physicians did not file a notice of appeal within thirty days of the October 2015 order dismissing their petition. Their counsel apparently did not receive timely notice of the dismissal, and when they subsequently learned of it, they filed a motion in March 2016 to set aside the dismissal and reenter it under Cambron v. Canal Ins. Co., 246 Ga. 147, 148-149 (1) (269 SE2d 426) (1980) (if court fails to give timely notice of final judgment to losing party, that party may move to have judgment set aside and reentered, so as to restart time to appeal). Two months later, the trial court granted that motion, set aside its October 2015 order of

II.

A.

The doctrine of sovereign immunity has been a part of our law for more than 230 years. By the time of the War for American Independence, the doctrine was "imbedded in the common law of England." Crowder v. Ga. Dept. of State Parks, 228 Ga. 436, 439 (3) (185 SE2d 908) (1971). See also W. Blackstone, 1 Commentaries on the Laws of England at 235-237 (1st ed. 1765). After the war was concluded, Georgia adopted the common law of England as our own,[9] see Tift v. Griffin, 5 Ga. 185, 189 (1848), and with it, we adopted the doctrine of sovereign immunity.[10] See Crowder, 228 Ga. at 439 (3). See also Gilbert v. Richardson, 264 Ga. 744, 745 (1) (452 SE2d 476) (1994); Hennessy v. Webb,

_____

dismissal, and again dismissed the case. The plaintiff-physicians filed a timely notice of appeal from the May 2016 reentry of the dismissal order.

[9] In 1784, our General Assembly adopted the statutes and common law of England as of May 14, 1776, except to the extent that they were displaced by our own constitutional or statutory law. Cobb's Digest, p. 721 (1851). That adoption of English statutory and common law remains in force today. See OCGA § 1-1-10 (c) (1). See also State v. Chulpayev, 296 Ga. 764, 780 (3) (b) (770 SE2d 808) (2015) ("The common law of England as of May 14, 1776, has long been the backstop law of Georgia . . . ." (Citation omitted)).

[10] In this respect, Georgia was not alone. See The Federalist: No. 81, at 422, by A. Hamilton (Gideon ed. 2001) ("It is inherent in the nature of sovereignty, not to be amenable to the suit of an individual *without its consent.* This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the union." (emphasis in original)).

7

245 Ga. 329, 329 (264 SE2d 878) (1980). Following its early adoption, the doctrine would persist in Georgia as a matter of common law for nearly two centuries. See Crowder, 228 Ga. at 440 (3).

At common law, the doctrine of sovereign immunity was broad. The State "could not, without its own express consent, be subjected to an action of any kind." Peeples v. Byrd, 98 Ga. 688, 693-694 (25 SE 677) (1896) ("It is hardly necessary to cite authority for the proposition that a sovereign State is not liable to suit at the instance of a citizen, unless permission to sue has been expressly granted."). See also Eibel v. Forrester, 194 Ga. 439, 441-442 (22 SE2d 96) (1942) ("Without its consent the State can not be sued at all."); Roberts v. Barwick, 187 Ga. 691, 694 (1) (1 SE2d 713) (1939) ("[T]he State can not by the courts be required to submit to being sued against its express consent."); Western Union Tel. Co. v. Western & A. R. Co., 142 Ga. 532, 535 (83 SE 135) (1914) ("[T]he State can not be sued, or subjected to an action of any kind, without special legislative authority."); Brunswick & A. R. Co. v. State of Ga., 48 Ga. 415, 418 (1873) ("The State cannot, against the will of the Legislature, be compelled to submit its liabilities to its own Courts."); Printup v. Cherokee R. Co., 45 Ga. 365, 367 (1872) ("[T]he State cannot be made a party to this suit

8

against or without her consent . . . ."). Most commonly, the doctrine was employed to bar suits for damages and other monetary relief. See, e.g., Roberts, 187 Ga. at 695-696 (2) (suit for failure of State to pay amounts owed under leases).

Even so, notwithstanding the popular, contemporary notion that sovereign immunity is principally about the protection of the public purse, see, e.g., Martin v. Dept. of Public Safety, 257 Ga. 300, 301 (1) (357 SE2d 569) (1987), the doctrine at common law was understood more broadly as a principle derived from the very nature of sovereignty. See Gilbert, 264 Ga. at 749, (4) n.7 ("Historically, governmental or sovereign immunity was justified as a recognition that it was a contradiction of the sovereignty of the king to allow him to be sued as of right in his own courts."). See also Roberts, 187 Ga. at 694 (1) ("The sovereignty of the State is supreme, and to maintain that sovereignty[,] the supremacy must also be maintained, and to do that the State must never be subjected to suit without its expressed consent."); Kawananakoa v. Polyblank, 205 U. S. 349, 353 (27 SCt 526, 51 LE 834) (1907) ("A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the

9

authority that makes the law on which the right depends." (Citations omitted)).

As such, it never was limited to suits for monetary damages. This Court applied

the doctrine to bar proceedings in equity for injunctive relief against threatened

and imminent wrongs. See, e.g., Southern Mining Co. v. Lowe, 105 Ga. 352,

356 (31 SE 191) (1898) (petition for injunctive relief to prevent execution of

contracts for convict labor); Peeples, 98 Ga. at 693-694 (petition for injunctive

relief to prevent allegedly illegal contract from being carried into effect). We

also applied it as a bar against suits for declaratory relief. See, e.g., Musgrove

v. Ga. R. & Banking Co., 204 Ga. 139, 158-159 (49 SE2d 26) (1948) (suit for

injunction and declaratory judgment concerning taxation of property).

Sovereign immunity at common law was broad in another sense too. The

doctrine was understood to apply not only when the State was sued eo nomine,[11]

but also in suits against its departments, agencies, and officers in their official

capacities. See, e.g., Cardin v. Riegel Textile Corp., 219 Ga. 695, 697 (2) (135

SE2d 284) (1964) (suit against State Board of Workmen's Compensation);

Roberts, 187 Ga. at 695 (2) (suit against "Columbus Roberts, not as an

individual but as Commissioner of Agriculture"); Southern Mining Co., 105 Ga.

---

[11] Latin for "[b]y or in that name." Black's Law Dictionary at 652 (10th ed. 2014).

at 356 (suit against prison commissioners as "representatives of the State in their official capacity"). The application of the doctrine to bar suits against state officers in their official capacities was unrelenting, even when it was alleged that the officers had acted without legal authority. See, e.g., Ramsey v. Hamilton, 181 Ga. 365, 377 (182 SE 392) (1935) (suit against state officers in their official capacities for allegedly unlawful disbursements and expenditures of public funds). What's more, the doctrine of sovereign immunity at common law was broad enough to bar some suits against public officers in their individual capacities, although only to the extent that the State itself could be said to be the real party in interest. See Roberts, 187 Ga. at 695 (2) ("The general rule that is applicable in all cases is that any case, regardless of who are named parties thereto, that could result in a judgment or decree that would in any manner affect or control the property or action of the State, in a manner not prescribed by statute, is a suit against the State and cannot be brought without her consent." (Citations omitted)). The doctrine sometimes worked to bar suits, for instance, in which the relief sought would tend to impair or affect the property or contractual interests of the State. See, e.g., Linder v. Ponder, 209 Ga. 746, 747-748 (75 SE2d 814) (1953) (suit against Commissioner of Agriculture

11

in his individual capacity, seeking injunctive relief and declaration of title as to land owned by the State, barred by sovereign immunity); Musgrove, 204 Ga. at 157 (even to the extent that state officer was sued in his individual capacity, "the plaintiff is here seeking to enforce what it claims to be a contract with the State of Georgia, and the State therefore . . . has a distinct and direct interest in the subject-matter of the litigation"); Printup, 45 Ga. at 367 ("If, therefore, there be anything in the judgment [against an individual agent of the State] affecting the interest or the status of the State as to the property covered by the bill, (and we think there is,) the judgment is, so far, reversed."). See also Frank J. Vandall, *Tort Liability of Public Officials*, 29 Mercer L. Rev. 303, 304-305 (I) (1977) (discussing limited application of sovereign immunity to suits against state officers in their individual capacities in cases in which the State itself is the real party in interest).

The doctrine of sovereign immunity at common law generally was inapplicable, however, in cases in which state officers in their individual capacities were alleged to have acted without legal authority, even if they acted under color of their offices. See Stewart v. Atlanta Beef Co., 93 Ga. 12, 19 (18 SE 981) (1893) (affirming judgment for damages against tax collector in his

12

individual capacity, noting that "[a] tax-collector has no authority, [by color of office], to deprive any citizen of his money or his property unless expressly so authorized to do by law; and he will not be protected, though apparently proceeding under the forms of law, when there is no law to authorize or justify his action"). As this Court explained in Cannon v. Montgomery, 184 Ga. 588, 591 (1) (192 SE 206) (1937),

> [a] suit can not be maintained against the State without its statutory consent. This general rule can not be evaded by making an action nominally one against the servants or agents of a State, when the real claim is against the State itself and it is the party vitally interested. Therefore, generally, where a suit is brought against an officer or agency of the State with relation to some matter in which the defendant represents the State in action and liability, and the State, while not a party to the record, is the real party against which relief is sought, so that a judgment for plaintiff, although nominally against the named defendant as an individual or entity distinct from the State, will operate to control the action of the State or subject it to liability, the suit is in effect one against the State. If, however, the sole relief sought is relief against the State officers, it is maintainable. . . . A suit may be maintained against officers or agents personally, because, while claiming to act officially, they have committed or they threaten to commit wrong or injury to the person or property of plaintiff, either without right and authority or contrary to the statute under which they purport to act.

13

(Citations omitted). See also Florida State Hosp. v. Durham Iron Co., 194 Ga. 350, 352-353 (2), (3) (a) (21 SE2d 216) (1942) (reconciling general rule that suits against officers in their official capacities are barred with principle that suits against officers in their individual capacities are "generally maintainable").

These principles extended at common law to suits for relief from the enforcement of laws that were alleged to violate the Constitution. The Court applied the doctrine of sovereign immunity to bar such suits in cases in which state officers were sued in their official capacities or in which the State itself otherwise was the real party in interest. See, e.g., Maddox v. Coogler, 224 Ga. 806, 808-809 (165 SE2d 158) (1968) (suit to enjoin members of state Mineral Leasing Commission from executing leases of state properties pursuant to allegedly unconstitutional statutes); Peters v. Boggs, 217 Ga. 471, 473-475 (2) (123 SE2d 258) (1961) (suit to enjoin allegedly unconstitutional appropriations of public funds for the support of desegregated schools); Ramsey, 181 Ga. at 377 (suit to enjoin disbursement and expenditure of public funds under allegedly unconstitutional appropriations act). In other cases, however, we found that the doctrine posed no bar to suits in which state officers were sued in their

14

individual capacities with respect to the enforcement of allegedly unconstitutional laws.

In Dennison Manufacturing Co. v. Wright, 156 Ga. 789 (120 SE 120) (1923), for instance, a Massachusetts manufacturer sued the state comptroller-general, who had collected a license and occupation tax from an agent of the manufacturer in Georgia. Alleging that the tax — which was imposed only upon agents of foreign or nonresident corporations — was an unconstitutional burden upon interstate commerce, the manufacturer sought monetary relief from the comptroller in the amount of the tax that the agent had paid. The comptroller raised sovereign immunity as a bar to the suit, but this Court held that the doctrine did not apply. To begin, we noted that "[w]e do not construe this action as one brought against the defendant in his official capacity, but as an action against him individually for an act which, while done in his official capacity, was wholly without lawful authority, and beyond the scope of his official power." 156 Ga. at 793. We then explained that the comptroller was individually liable for his collection of an unconstitutional tax under color of his office:

> Was the Comptroller-General individually liable to the plaintiffs for the exaction and collection of this occupation tax? We have seen that under the facts of

this case[,] this tax was illegal. . . . Would the Comptroller-General . . . be exempt from liability on the ground that he demanded and collected this tax under such unconstitutional statute? This is the vital question in the case. An unconstitutional statute, though having the form, features, and name of law, is in reality no law. It is wholly void. In legal contemplation it is as inoperative as if it had never been passed. It has been declared that it is a misnomer to call such statute a law. Such a statute confers no authority upon any one, and affords protection to no one.

. . .

So the Comptroller-General will not be protected from individual liability under this general tax act, if it in fact imposes an occupation tax upon the plaintiffs, for the reason that such act is unconstitutional so far as the plaintiffs are concerned. As an unconstitutional act confers no authority upon an officer, his acts thereunder are the same as if no statute on the subject existed. He is as much without authority to enforce a tax levy under an unconstitutional statute as he would be to levy and collect such tax in the absence of any statute. This being so . . . the Comptroller-General is individually liable, under the facts stated in the petition of the plaintiffs, for the exaction and collection of this tax from them.

Id. at 796-798 (citations omitted). In the end, we added that, "should there be

any recovery against the defendant, the legislature should, and doubtless will,

reimburse the defendant, as the State has received the money raised by the exaction of this tax." Id. at 798.

In Holcombe v. Ga. Milk Producers Confederation, 188 Ga. 358 (3 SE2d 705) (1939), we considered a suit for injunctive relief from the enforcement of an allegedly unconstitutional statute. There, a cooperative association of milk producers brought suit against the members of the state milk-control board, alleging that the Georgia Milk Control Act of 1937 was unconstitutional. Although we ultimately concluded that the statute was constitutional, we held that the suit was not barred by the doctrine of sovereign immunity. Citing Dennison, we noted that the members of the milk-control board were sued "as individuals," who had acted under color of, but allegedly without, lawful authority. 188 Ga. at 362 (1). As such, we concluded, the suit was not one against the State, and the doctrine of sovereign immunity posed no bar:

> That an officer charged with the administration of a law alleged to be unconstitutional is not in so acting an officer of the State, and that a suit to enjoin him cannot be said to be a suit against the State, is illustrated by the nature of an unconstitutional statute in the eyes of the law. . . . An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed. Where

17

an act is attacked as unconstitutional, and it appears that [the] plaintiff is threatened with irreparable injury to his property by reason of the acts of an officer proceeding under and by virtue of such act, the suit against such officer cannot be considered as one against the State, but the court will take jurisdiction of it as a suit against the officer as an individual acting without constitutional authority, and determine the question of the validity of the act. In the present case[,] the State is not a party to the record. No judgment is asked which will take the property of the State, or fasten a lien on it, or interfere with the disposition of funds in its treasury, or compel the State indirectly, by controlling its officers, to affirmatively perform any contract, or to pay any debt, or direct the exercise of any discretion committed to its officers. In view of what has been said, the petition was not subject to the demurrer setting up that the suit was one against the State.

Id. at 363-364 (citations and punctuation omitted).

Another example is Undercofler v. Eastern Air Lines, Inc., 221 Ga. 824 (147 SE2d 436) (1966), a case in which an airline sued the state revenue commissioner and state director of sales and use taxes, who had threatened to assess sales and use taxes for fuel and parts used by the airline in interstate commerce, as well as for food served to passengers outside Georgia on interstate flights. The airline sought injunctive and declaratory relief from the assessment of such taxes, asserting that the applicable statute did not actually impose such

18

taxes, and if it did, it would unconstitutionally burden interstate commerce. The commissioner and director contended that the suit was barred by the doctrine of sovereign immunity, but citing Dennison, we disagreed:

> [T]his suit comes within the *well established rule* that [a] suit may be maintained against officers or agents personally, because, while claiming to act officially, they have committed or they threaten to commit wrong or injury to the person or property of [the] plaintiff, either without right and authority or contrary to the [legal authority] under which they purport to act. Although a defendant may assert that he acted officially and on behalf of the State, a suit of this class is not a suit against the State.

221 Ga. at 829 (1) (citations and punctuation omitted; emphasis added). Numerous other Georgia precedents are consistent with the principles set forth in Dennison and its progeny. See Irwin v. Arrendale, 117 Ga. App. 1, 2-3 (2) (159 SE2d 719) (1967) (citing cases).

## B.

The doctrine of sovereign immunity would not persist forever merely as a matter of common law. By the early 1970s, the doctrine was under assault in Georgia, at least as it was applied in tort cases. Our Court had acknowledged long before that sovereign immunity sometimes was a "harsh rule," but we

19

explained then that abrogation or waiver of the doctrine was a matter for the General Assembly:

> [I]f it does not have the approval of the people of the State, there is a definite way, a plain way, and a legal way, whereby it can be changed. This court has always held that the State could expressly consent to be sued. Therefore a simple and brief enactment of the legislature giving this consent is all that is required in order to permit a suit against the State.

Roberts, 187 Ga. at 694 (1). The harshness of the doctrine was especially striking in cases in which it was applied to bar suits in tort to recover monetary damages for injuries to persons and property, and in one such case, the parties asked our Court to recognize the abrogation of the doctrine. When we decided Crowder in 1971, a bare majority of the Court adhered to the view that the abrogation or waiver of the doctrine "is a matter of public policy[,] which addresses itself to the legislative, not the judicial, branch of our State government." Crowder, 228 Ga. at 440 (3). Three members of the Court dissented and stood ready to declare the doctrine at an end, at least in tort cases. See id. at 441 (Nichols, J., dissenting); id. at 444 (Felton, J., dissenting); id. at 446 (Hawes, J., dissenting). The split decision in Crowder did not put the question to rest, and indeed, three years later, this Court would grant petitions

for writs of certiorari in two other cases, both for the express purpose of yet again reconsidering sovereign immunity in tort cases.[12] See Sheley v. Bd. of Public Education, 233 Ga. 487, 487 (212 SE2d 627) (1975).

The General Assembly responded quickly to our decision in Crowder. When it met for its 1973 Session, the General Assembly proposed to amend the Constitution of 1945 to expressly reserve the doctrine of sovereign immunity as a matter of constitutional law. Under the amendment, only the Constitution itself or an act of the General Assembly would waive sovereign immunity, and to provide a means by which the General Assembly might ameliorate the harshness of the doctrine, the amendment authorized the General Assembly to establish a State Court of Claims in which claims against the State for injury or damage could be tried.[13] See Ga. L. 1973, p. 1489. In November 1974, the voters of

---

[12] The assault on sovereign immunity was not limited to our court. In 1974, the Court of Appeals entertained, but ultimately rejected, arguments that "this doctrine of sovereign immunity be swept away by judicial decree." Azizi v. Bd. of Regents of the Univ. System, 132 Ga. App. 384, 385-387 (1) (208 SE2d 153) (1974).

[13] In its entirety, the amendment provided:
> The General Assembly is hereby authorized to create and establish a State Court of Claims with jurisdiction to try and dispose of cases involving claims for injury or damage, except the taking of private property for public purposes, against the State of Georgia, its agencies or political subdivisions, as the General Assembly may provide by law. Notwithstanding any

21

Georgia ratified the amendment, and at that point, the doctrine of sovereign immunity was a matter of mere common law no more. See Ga. Const. of 1945, Art. VI, Sec. II, Par. X (as amended in 1974). The 1974 amendment subsequently was carried forward into the Constitution of 1976. See Ga. Const. of 1976, Art. VI, Sec. V, Par. I.

This Court promptly acknowledged the 1974 amendment, noting that it gave "constitutional status" to the doctrine of sovereign immunity. Sheley, 233 Ga. at 488. Importantly, we acknowledged as well that sovereign immunity at common law, as it long had been understood by Georgia courts, and the sovereign immunity reserved by the 1974 amendment were one and the same:

other provision of this Constitution, the General Assembly may provide for exclusive jurisdiction over such cases in the State Court of Claims, provide for trial of such cases without a jury, and prescribe the place and manner in which such cases may be brought and tried. The Supreme Court and the Court of Appeals shall have original jurisdiction to try and correct errors of law from such State Court of Claims according to the method of appeal to said courts now provided for or as may hereafter be provided by law. Nothing contained herein shall constitute a waiver of the immunity of the State from suit, but such sovereign immunity is expressly reserved except to the extent of any waiver of immunity provided in this Constitution and such waiver or qualification of immunity as is now or may hereafter be provided by act of the General Assembly.

Ga. L. 1973, p. 1489.

"Because of the adoption of this constitutional amendment, and it is now effective as a part of our Constitution, we hold that the immunity rule *as it has heretofore existed in this state* cannot be abrogated or modified by this [C]ourt."[14] Id. (emphasis added). Consistent with these understandings, after the doctrine of sovereign immunity was given constitutional status, this Court continued to observe the traditional distinction between suits against state officers in their official capacities, which are barred by sovereign immunity, and those against state officers in their individual capacities, which generally are not. See Hennessy v. Webb, 245 Ga. 329, 330 (264 SE2d 878) (1980). And in suits for injunctive and declaratory relief from official acts that were alleged to be unconstitutional, we continued to adhere to Dennison and its progeny. See Chilivis v. Nat. Distributing Co., 239 Ga. 651, 654 (1) (238 SE2d 431) (1977).

The doctrine of sovereign immunity retained its constitutional status in the Constitution of 1983, which provided at its adoption that "[s]overeign immunity extends to the state and all of its departments and agencies." Ga. Const. of 1983,

---

[14] In the sense that the 1974 amendment divested the courts of any authority they might previously have had to abrogate or modify the doctrine of sovereign immunity, it "created an entirely new ball game." Sustainable Coast, 294 Ga. at 601 (2) (citation and punctuation omitted).

Art. I, Sec. II, Par. IX (as originally adopted).[15] The Constitution of 1983,

however, changed the means by which sovereign immunity could be waived.

The General Assembly had never exercised its authority under the 1974

amendment to establish a State Court of Claims, see R. Perry Sentell, Jr., *Local*

*Government Tort Liability: The Summer of '92*, 9 Ga. St. U. L. Rev. 405, 407

(II) (B) (1993) (hereinafter Sentell, *Tort Liability*), and so, the Constitution of

---

[15] At the time of the original adoption of the Constitution of 1983, Article I, Section II, Paragraph IX provided in its entirety:

> Sovereign immunity extends to the state and all of its departments and agencies. However, the defense of sovereign immunity is waived as to any action ex contractu for the breach of any written contract now existing or hereafter entered into by the state or its departments and agencies. Also the defense of sovereign immunity is waived as to those actions for the recovery of damages for any claim against the state or any of its departments and agencies for which liability insurance protection for such claims has been provided but only to the extent of any liability insurance provided. Moreover, the sovereign immunity of the state or any of its departments and agencies may hereafter be waived further by Act of the General Assembly which specifically provides that sovereign immunity is hereby waived and the extent of the waiver. No waiver of sovereign immunity shall be construed as a waiver of any immunity provided to the state or its departments and agencies by the United States Constitution. The provisions of this paragraph shall not have the effect of permitting the state or any of its departments or agencies to interpose the defense of sovereign immunity as to any action against the state or any of its departments or agencies filed prior to January 1, 1983, if such defense could not have been interposed on December 31, 1982.

Ga. L. 1982, p. 2546.

1983 omitted any reference to a State Court of Claims. Although it retained the principle that sovereign immunity could be waived by the Constitution itself or an act of the General Assembly, the Constitution of 1983 added that a subsequently enacted statute would waive sovereign immunity only if it "specifically provides that sovereign immunity is hereby waived and the extent of the waiver." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (as originally adopted). The Constitution of 1983 also waived sovereign immunity in suits for breach of a written contract, as well as in suits for monetary damages to the extent that such damages were covered by liability insurance. Id. See also Sentell, *Tort Liability*, supra, at 407-408 (II) (C) (discussing changes worked by Constitution of 1983).

This Court recognized the Constitution of 1983 as a continuation for the State of the constitutional reservation of the sovereign immunity that had been recognized by the Georgia courts since the Founding, see Toombs County v. O'Neal, 254 Ga. 390, 391 (1) (330 SE2d 95) (1985), and consistent with that recognition, we continued to adhere to the rule at common law that suits against state officers in their official capacities amount to suits against the State itself and are barred by sovereign immunity. See Price v. Dept. of Transp. of Ga., 257

25

Ga. 535, 537 (361 SE2d 146) (1987). The waiver provisions newly adopted with the Constitution of 1983, however, proved to be "grist for the litigational mills," Sentell, *Tort Liability*, supra, at 408 (II) (D), and the decisional law applying these waiver provisions ultimately would lead to yet another evolution of the constitutional reservation of sovereign immunity. In a series of cases, this Court construed the reservation of sovereign immunity in Article I, Section II, Paragraph IX to extend not only to the State itself, but also to counties, see Toombs County, 254 Ga. at 391 (1), to school districts, see Thigpen v. McDuffie County Bd. of Education, 255 Ga. 59, 59 (335 SE2d 112) (1985) (plurality opinion), and later, to municipalities.[16] See Hiers v. City of Barwick, 262 Ga. 129, 131 (2) (414 SE2d 647) (1992). As a result, the immunity of those governments with respect to monetary damages was waived to the extent of their liability insurance. See Sentell, *Tort Liability*, supra, at 408-411 (discussing decisional law extending sovereign immunity of the State to counties, school districts, and municipalities). In addition, this Court relied on Article I, Section

[16] The Court applied Article I, Section II, Paragraph IX to counties, school districts, and municipalities, notwithstanding that the immunity of those local governments is addressed specifically by another constitutional provision. See Ga. Const. of 1983, Art. IX, Sec. II, Par. IX ("The General Assembly may waive the immunity of counties, municipalities, and school districts by law.").

26

II, Paragraph IX to hold that the purchase of liability insurance for employees of a state department would waive the sovereign immunity of the department itself, see Martin, 257 Ga. at 303 (2), and we held that the General Assembly was without the authority to reserve sovereign immunity by statute to the extent that a department or agency had purchased liability insurance. See Price, 257 Ga. at 536, n.2.

In the wake of these decisions, the General Assembly proposed to revise Article I, Section II, Paragraph IX, see Ga. L. 1990, p. 2435, and in November 1990, the voters approved the proposal.[17] Effective as of January 1, 1991, this constitutional amendment repealed the provision waiving sovereign immunity to the extent of liability insurance, and it added a provision that, for the first time, expressly authorized the General Assembly to enact a State Tort Claims Act, among other changes. See Curtis v. Bd. of Regents of Univ. System of Ga., 262 Ga. 226, 227 (416 SE2d 510) (1992). See also Sentell, *Tort Liability*, supra, at 411-412, 415-423 (III). But most important for our purposes, the 1991 amendment carried forward the constitutional reservation of sovereign immunity

---

[17] We rejected a challenge to the adoption of this constitutional amendment in Donaldson v. Dept. of Transp., 262 Ga. 49, 50-52 (1) (414 SE2d 638) (1992).

at common law as it was understood in Georgia, using the same language as the original Constitution of 1983 to reaffirm that "sovereign immunity extends to the state and all of its departments and agencies." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e) (as amended). See also Gilbert, 264 Ga. at 746-747 (2). Likewise, the 1991 amendment also retained that sovereign immunity could only be waived by the Constitution itself or the General Assembly, and as to the General Assembly, only by way of a law that "specifically provides that sovereign immunity is thereby waived and the extent of such waiver."[18] Ga.

[18] As amended in 1991, Article I, Section II, Paragraph IX provides as follows as to sovereign immunity:

> (a) The General Assembly may waive the state's sovereign immunity from suit by enacting a State Tort Claims Act, in which the General Assembly may provide by law for procedures for the making, handling, and disposition of actions or claims against the state and its departments, agencies, officers, and employees, upon such terms and subject to such conditions and limitations as the General Assembly may provide.
> (b) The General Assembly may also provide by law for the processing and disposition of claims against the state which do not exceed such maximum amount as provided therein.
> (c) The state's defense of sovereign immunity is hereby waived as to any action ex contractu for the breach of any written contract now existing or hereafter entered into by the state or its departments and agencies.
> . . .
> (e) Except as specifically provided in this Paragraph, sovereign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state

28

Const. of 1983, Art. I, Sec. II, Par. IX (e) (as amended). See also <u>Gilbert</u>, 264

Ga. at 748 (3).

## C.

In 1995, we decided <u>IBM Corp. v. Evans</u>, 265 Ga. 215 (453 SE2d 706)

(1995), and in that split decision, a majority of the Court abandoned the

understanding at common law that sovereign immunity bars suits against the

State, its departments, and its officers in their official capacities for injunctive

relief. The majority acknowledged that earlier cases routinely distinguished

between suits against officers in their official capacities (which were barred by

sovereign immunity) and those against officers in their individual capacities

(which often were not). The majority then cast aside that distinction as a "legal

fiction" that had caused confusion, and it announced that "a suit for injunctive

relief to restrain an illegal act" was excepted altogether from the bar of

---

and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.

(f) No waiver of sovereign immunity under this Paragraph shall be construed as a waiver of any immunity provided to the state or its departments, agencies, officers, or employees by the United States Constitution.

sovereign immunity. 265 Ga. at 216 (1). Justice Benham, joined by Justice Hunstein, dissented, urging fidelity to the doctrine of sovereign immunity as it had been understood at common law by the Georgia courts for many years. See id. at 220-222 (Benham, P. J., dissenting) ("It is a long-standing principle of Georgia law that sovereign immunity is not applicable where an injunction is sought to prevent the commission of an alleged wrongful act by an officer of the state acting under color of office but without lawful authority and beyond the scope of official power because such a suit is not against the state, but against an individual stripped of his official character." (Citation and emphasis omitted)).

Evans marked a drastic departure from our traditional understanding of sovereign immunity, but it was not long for our jurisprudence. Three years ago, we corrected course in Sustainable Coast and overruled Evans, putting the decisional law back on the track that leads from the common law. See 294 Ga. at 593. In Sustainable Coast, we reaffirmed that the doctrine of sovereign immunity bars suits against the State, its departments and agencies, and its officers in their official capacities for injunctive relief, except to the extent that sovereign immunity is waived by the Constitution itself or the statutory law. See

30

id. at 602-603 (2). Our holding in <u>Sustainable Coast</u> was premised explicitly upon our recognition of two fundamental principles that are embodied by the provisions of Article I, Section II, Paragraph IX of the Constitution of 1983. First, we acknowledged that the doctrine of sovereign immunity was born at common law, and it was *that* doctrine — sovereign immunity at common law as understood traditionally by the Georgia courts — that had been reserved constitutionally, beginning with the 1974 amendment of the Constitution of 1945. See id. at 597 ("This common law doctrine of sovereign immunity was afforded constitutional status in 1974." (Citation omitted)). Second, we recognized that the Constitution of 1983, as amended in 1991, quite clearly reserved the power to abrogate, limit, or waive the doctrine of sovereign immunity to the People themselves and their elected representatives in the General Assembly. See id. at 598 ("[T]he 1991 amendment to our Constitution restored to the legislature the exclusive power to waive sovereign immunity." (Citation omitted)). Consistent with these principles, we discerned that "the courts no longer ha[ve] the authority to abrogate or modify the doctrine." Id. at 597 (citation omitted). And in closing, we explained: "Our decision today does not mean that citizens aggrieved by the unlawful conduct of public officers are

31

without recourse. It means only that they must seek relief against such officers in their individual capacities." Id. at 603.

We followed up Sustainable Coast with our decision in Olvera. In that case, we considered whether the doctrine of sovereign immunity extends to suits for declaratory relief. We began in Olvera with the observation that "[t]he sweep of sovereign immunity under the Georgia Constitution is broad," 298 Ga. at 426, and we held that, "absent some exception," it applies to bar suits against the State for declaratory relief. Id. at 427. Just as we had done in Sustainable Coast, we explained that, if such an "exception" were to be found, it must be found in the Constitution itself, see id. at 426 n.1, or in the statutory law. See id. at 426. We then looked to the statutory law under which the plaintiffs brought their suit, but we found no specific waiver of sovereign immunity. See id. at 427-428. We again concluded by noting that aggrieved citizens might properly seek relief

against state officers in their individual capacities. See id. at 428.[19] Keeping this important historical context in mind, we now turn back to the case at hand.

III.

The plaintiff-physicians brought this lawsuit against twenty state officers in their official capacities only, seeking injunctive and declaratory relief from official acts that would, they allege, violate various provisions of the Constitution of 1983. But as our precedents make clear, a suit against a state officer in his official capacity amounts to a suit against the State itself, Cameron v. Lang, 274 Ga. 122, 126 (3) (549 SE2d 341) (2001),, and the doctrine of sovereign immunity bars suits against the State to which the State has not consented. See Gilbert, 264 Ga. at 745-746 (1). Sovereign immunity extends to suits for injunctive relief, Sustainable Coast, 294 Ga. at 603 (2), and it extends as well to suits for declaratory relief, see Olvera, 298 Ga. at 427. Moreover, as

---

[19] A few weeks after Olvera, we decided TDGA, LLC v. CBIRA, LLC, 298 Ga. 510 (783 SE2d 107) (2016), where we once again employed the principles of Sustainable Coast and concluded that sovereign immunity extends as well to conventional quiet title actions. See 298 Ga. at 511-512. At the same time, we held that the doctrine does not bar suits to quiet title against all the world because such suits are in rem and not, properly understood, directed against the State, its departments or agencies, or its officers in their official capacities. See id. at 512. A concurring opinion noted that, even if sovereign immunity extended to suits to quiet title against all the world, the statutory law specifically (albeit impliedly) waived application of the doctrine in such suits. See id. at 514-516 (Nahmias, J., concurring).

33

we made clear in <u>Sustainable Coast</u> and its progeny, precisely because the doctrine of sovereign immunity at common law has been constitutionally reserved, the doctrine applies today just as it applied at common law. And at common law, it was understood by the Georgia courts that sovereign immunity would bar a suit against a state officer in his official capacity for injunctive relief against official acts that were alleged to be unconstitutional. See, e.g., <u>Maddox</u>, 224 Ga. at 808-809; <u>Peters</u>, 217 Ga. at 473-475 (2); <u>Ramsey</u>, 181 Ga. at 377.

Therefore, unless the State has consented to this lawsuit, it is barred by the doctrine of sovereign immunity. Consent to suit can only be given by the Constitution itself or by an act of the General Assembly. <u>SJN Properties, LLC v. Fulton County Bd. of Assessors</u>, 296 Ga. 793, 799 (2) (b) (i) (770 SE2d 832) (2015). The parties here point to no statutory law that works a specific waiver of sovereign immunity for suits like this one, and so, the dispositive question is whether the Constitution of 1983 authorizes such a suit. The plaintiff-physicians say that it does. They are incorrect.

A.

34

To begin, the plaintiff-physicians argue that the Bill of Rights authorizes suits against the State to vindicate the rights guaranteed therein. In this respect, they rely especially upon their claim that House Bill 954 violates a constitutional right of privacy guaranteed in part by the Due Process Clause, citing our statement in Powell v. State, 270 Ga. 327, 329 (3) (510 SE2d 18) (1998), that due process is "a fundamental constitutional right, having a value so essential to individual liberty in our society that its infringement merits careful scrutiny by the courts." (Citation and punctuation omitted). And they contend that the constitutional guarantee of a right — especially a right as fundamental as due process — necessarily must imply a right of action against the government for violation of that right.

As the plaintiff-physicians correctly note, this Court has said in a number of cases that "[t]he violation by a [government] of a constitutional right of the citizen must by necessary implication raise a cause of action in favor of the citizen against the [government], unless some means of redress other than suit has been afforded by the legislature." Smith v. Floyd County, 85 Ga. 420, 424 (11 SE 850) (1890). See also Baranan v. Fulton County, 232 Ga. 852, 856 (209 SE2d 188) (1974); Waters v. DeKalb County, 208 Ga. 741, 745 (1) (69 SE2d

35

274) (1952); <u>State Highway Bd. v. Hall</u>, 193 Ga. 717, 719 (20 SE2d 21) (1942);

<u>Harrison v. State Highway Dept.</u>, 183 Ga. 290, 299 (188 SE 445) (1936);

<u>Tounsel v. State Highway Dept.</u>, 180 Ga. 112, 117-118 (178 SE 285) (1935);

<u>Millwood v. DeKalb County</u>, 106 Ga. 743, 747-748 (32 SE 577) (1899). But in

*every one* of those cases, we were speaking with reference to a particular

constitutional right, the right to just and adequate compensation for private

property taken by the government for a public use. See Ga. Const. of 1983, Art.

I, Sec. III, Par. I (a). The Georgia courts have long understood the Takings

Clause — which specifically prescribes just and adequate compensation as the

remedy for an uncompensated taking — to imply a right of action against the

government. See, e.g., <u>Powell v. Ledbetter Bros., Inc.</u>, 251 Ga. 649, 650-651 (2)

(307 SE2d 663) (1983), overruled on other grounds, <u>David Allen Co. v. Benton</u>,

260 Ga. 557, 558 (398 SE2d 191) (1990); <u>Taylor v. Richmond County</u>, 185 Ga.

610, 611-612 (196 SE 37) (1938); <u>Terrell County v. York</u>, 127 Ga. 166, 168 (56

SE 309) (1906); <u>State Highway Bd. v. Ward</u>, 42 Ga. App. 220, 220-221 (155 SE

384) (1930). Indeed, when we spoke in <u>Sustainable Coast</u> about the principle

that the Constitution itself may waive sovereign immunity in some cases, we

identified the Takings Clause as an illustration of that principle.[20] See 294 Ga. at 600 (2).

This Court, however, has rejected the idea that other constitutional provisions imply a right of action against the government that suffices to waive sovereign immunity for suits to vindicate those provisions. See, e.g., Maddox, 224 Ga. at 808-809; Peters, 217 Ga. at 473-475 (2); Ramsey, 181 Ga. at 377. Unlike the Takings Clause, many constitutional guarantees of right do not identify in specific and explicit terms a justiciable remedy for violations of the guarantee, nor are they without meaning in the absence of a right of action against the government itself. The Due Process Clause, for instance, guarantees that "[n]o person shall be deprived of life, liberty, or property except by due process of law," Ga. Const. of 1983, Art. I, Sec. I, Par. I, but what is to be done

---

[20] We are not alone in this respect. As the commentary to the Restatement (Second) of Torts explains:

> [M]ost [state] constitutions have a provision prohibiting the taking of property for public purposes without just compensation. These provisions have usually been held to be self-executing and to constitute a consent to suit, so that even though the legislature has failed to establish any procedure for litigating the claims, resort to the courts is held to be open for a "taking," or in many States, a damaging of private property for a public purpose within the terms of the constitution.

Restatement (Second) of Torts § 895B, comment (a).

to remedy a deprivation of due process is not set forth in the constitutional text, and due process often can be vindicated by raising it defensively in proceedings commenced by the government. Consistent with that understanding, this Court — more than a hundred years ago — squarely rejected the notion that the Due Process Clause expressly or by implication affords a right of action against the government. Bailey v. Fulton County, 111 Ga. 313, 314 (36 SE 596) (1900). In so holding, we distinguished Smith — the case in which we first said that a violation of a constitutional right by necessary implication affords a right of action against the government — as a case "of an altogether different character." Id. We explained that cases like Smith "turned upon the constitutional right of persons whose property is taken or damaged for public uses to have just and adequate compensation for the same, and the corresponding liability which would necessarily attach [when property was taken or damaged without such compensation]." Id. And we noted that the Takings Clause had been "held to create a right, irrespective of express legislative enactment, to bring an action against [the government]." Id. See also State Bd. of Education v. Drury, 263 Ga. 429, 434 (3) (437 SE2d 290) (1993) (distinguishing Takings Clause cases and noting that constitutional doctrine of sovereign immunity forbids the courts to

38

fashion a damages remedy not afforded by statute to redress injuries sustained under unconstitutional rules and regulations).

That the constitutional guarantees upon which the plaintiff-physicians rely are fundamental ones cannot be reasonably disputed. But in light of our precedents — many of which were decided when sovereign immunity was only a doctrine of the common law — we find no compelling reason to reverse course now and hold that those guarantees imply a right of action against the government sufficient to overcome the constitutional doctrine of sovereign immunity. Indeed, the Due Process Clause has not changed since we decided Bailey. What has changed is the status of sovereign immunity. If the Due Process Clause was not sufficient to overcome sovereign immunity as a matter of common law in Bailey, we do not understand how it could overcome constitutional sovereign immunity today.[21] The indisputably important nature of the constitutional guarantees upon which the plaintiff-physicians challenge House Bill 954 does not work a waiver of sovereign immunity.

---

[21] Some of the other provisions of the Bill of Rights upon which the plaintiff-physicians base their claims are certainly as important and fundamental as the Due Process Clause. But the plaintiff-physicians offer no argument based on constitutional text, structure, or history from which we might properly conclude that those other provisions are more fairly understood to waive sovereign immunity than the Due Process Clause.

B.

Next, at least with respect to their claims for declaratory relief, the plaintiff-physicians urge that sovereign immunity is effectively waived by the Judicial Review Clause, which provides: "Legislative acts in violation of this Constitution or the Constitution of the United States are void, and the judiciary shall so declare them." Ga. Const. of 1983, Art. I, Sec. II, Par. V. They seem to suggest that the Judicial Review Clause is some sort of constitutional warrant for the courts to freely entertain any suit against the State, so long as the object of the suit is a judicial declaration as to the constitutionality of a statute. The plaintiff-physicians misunderstand the Judicial Review Clause.

When we inquire into the meaning of a constitutional provision, we look to its text, and our object is to ascertain "the meaning of the text at the time it was adopted." Georgia Motor Trucking Assn. v. Dept. of Revenue, 301 Ga. 354, 357 (2) (801 SE2d 9) (2017) (citation and punctuation omitted). See also Smith v. Baptiste, 287 Ga. 23, 32 (2) (694 SE2d 83) (2010) (Nahmias, J., concurring) ("Our task in interpreting the Constitution is to determine the meaning of the language used in that document to the people who adopted it as the controlling law of our State."). When we look to the constitutional text, we must bear in

40

mind that "Constitutions are the result of popular will, and their words are to be understood ordinarily in the sense they convey to the popular mind." Clarke v. Johnson, 199 Ga. 163, 164 (33 SE2d 425) (1945). For that reason, we must "afford the constitutional text its plain and ordinary meaning, view the text in the context in which it appears, and read the text in its most natural and reasonable way, as an ordinary speaker of the English language would." Georgia Motor Trucking Assn., 301 Ga. at 356 (2) (citation and punctuation omitted). For relevant context, we may look to, among other things, "the other law — constitutional, statutory, and common law alike — that form[ed] the legal background of the [constitutional] provision in question [at the time of its adoption]." Tibbles v. Teachers Retirement System of Ga., 297 Ga. 557, 558 (1) (775 SE2d 527) (2015) (citation and punctuation omitted). In that respect, we must remember that

> [a] constitutional provision must be presumed to have been framed and adopted in the light and understanding of prior and existing laws and with reference to them. Constitutions, like statutes, are properly to be expounded in the light of conditions existing at the time of their adoption.

Clarke, 199 Ga. at 166 (citation omitted).

41

A version of the Judicial Review Clause first appeared in the Constitution of 1861,[22] and at the time of its adoption, its text would have been understood quite clearly to embody the familiar doctrine of judicial review — the principle that courts sometimes may have to choose among conflicting rules of decision to resolve a case, and if one of those rules of decision is a constitutional one, the constitutional rule must prevail. As this Court described the doctrine in one early decision,

> the conclusion to which the whole country has come, with a concurrence of opinion and unanimity of sentiment, which leaves no room to doubt its correctness is, that the Constitution is the permanent law of the land; and that all legislative acts which impugn its provisions, are not merely voidable, but absolutely void. That the question was between conflicting laws, one of which must give way and the other stand; and the whole point was, whether the Court, who could execute but one of the laws, had a

[22] That version of the Judicial Review Clause provided: "Legislative Acts in violation of *the fundamental law* are void; and the Judiciary shall so declare them." Ga. Const. of 1861, Art. I, Sec. XVII (emphasis added). In the Constitution of 1865, the clause was revised to read: "Legislative Acts in violation of *the Constitution* are void, and the Judiciary shall so declare them." Ga. Const. of 1865, Art. I, Sec. XIII (emphasis added). Three years later, the clause was revised again: "Legislative acts in violation of *this constitution, or the Constitution of the United States*, are void, and the judiciary shall so declare them." Ga. Const. of 1868, Art. I, Sec. XXXII (emphasis added). Since then, the clause has been carried forward into successive Constitutions, in terms that are virtually identical to the clause as it appeared in the Constitution of 1868. See, e.g., Ga. Const. of 1877, Art. I, Sec. IV, Par. II; Ga. Const. of 1945, Art. I, Sec. IV, Par. II; Ga. Const. of 1976, Art. I, Sec. II, Par. VIII.

> right to decide whether there was a conflict, and which should yield? That the Judiciary owe a duty to the Constitution above that which they owe to the Legislature, and that when one says one thing and the other a contrary thing, they must obey the Constitution, which is in effect, deciding against the law.

Winter v. Jones, 10 Ga. 190, 194 (1851) (emphasis omitted).

By 1861, the doctrine of judicial review had been employed by Georgia courts for several decades. See Albert B. Saye, A Constitutional History of Georgia at 188-194 (1948). Indeed, we invoked it at the very first session of this Court in 1846, determining that a statutory provision that prohibited the carrying of arms openly was inconsistent with the constitutional guarantee of the right to keep and bear arms, and declaring that the statute was, therefore, void. See Nunn v. State, 1 Ga. 243, 251 (1846). And nationally, of course, the doctrine had received its most famous judicial treatment several decades earlier in Marbury v. Madison, 5 U. S. 137, 177-180 (2 LE 60) (1803):

> It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.
> So if a law be in opposition to the constitution; if both the [statutory] law and the constitution apply to a

43

particular case, so that the court must either decide that case conformably to the [statutory] law, disregarding the constitution; or conformably to the constitution, disregarding the [statutory] law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.

If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply.

. . .

[A] law repugnant to the constitution is void; and [the] courts, as well as other departments, are bound by that instrument.

5 U. S. at 177-180. The words of the Judicial Review Clause clearly are a reference to this doctrine of judicial review.

We find no indication that this constitutional reference to judicial review would have been understood in 1861 to imply a right of action against anyone, much less a right of action *against the State*. It certainly would not have been understood to imply a right of action for declaratory relief, which was a remedy unknown at common law, see Southern R. Co. v. State of Ga., 116 Ga. 276, 278-279 (42 SE 508) (1902), and one that would not be recognized in Georgia until the enactment of the Declaratory Judgment Act in 1945. See Clein v. Kaplan,

201 Ga. 396, 403-404 (40 SE2d 133) (1946). Nor can we discern any other right of action that might have been understood at the time of adoption to arise by implication from the Judicial Review Clause.

The early cases do not suggest in any way that judicial review was understood to confer upon the courts a jurisdiction that they otherwise did not have. To the contrary, judicial review was understood in the middle of the Nineteenth Century simply as a rule of necessity to permit the courts to resolve cases within their settled and existing jurisdiction when the proper resolution of those cases required a judicial choice between conflicting rules of decision. As this Court explained in Beall v. Beall, 8 Ga. 210, 219 (1850):

> Now, let us suppose, that the Legislature should pass an Act manifestly repugnant to some part of the Constitution, and that the operation and validity of both should come regularly in question, before any Court. The business and design of the judicial power is, to administer justice, according to the law of the land. According to two contradictory rules, justice, in the nature of things, cannot possibly be administered. One of them must, of necessity, give place to the other. Both, according to our supposition, come regularly before the Court, for its decision on their operation and validity. It is the right, and it is the duty, of the Court, to decide upon them. Its decision must be made, for justice must be administered, according to the law of the land. When the question occurs — What is the law

of the land? — it must also decide this question. In what manner is this question to be decided? The answer seems to be a very easy one. The supreme power has given one rule — a subordinate power has given a contradictory rule; the former is the law of the land; as a necessary consequence, the latter is void, and has no operation.

(Citation and emphasis omitted.)

The Judicial Review Clause is merely a constitutional recognition of the inherent authority of a court to resolve conflicts between the Constitution itself and the statutory law, when the resolution of such conflicts is essential to the decision of a case already properly before the court. See Walter McElreath, A Treatise on the Constitution of Georgia § 1137 (1912) (noting that courts may be "called upon, *in a proper case*, to pass upon the constitutionality of a law" (emphasis added)). Sovereign immunity, on the other hand — like various other rules of jurisdiction and justiciability — is concerned with the extent to which a case properly may come before a court at all. It is no more an impediment to judicial review than the other doctrines and rules that sometimes preclude decisions on the merits, including the limits of subject-matter and personal jurisdiction; exhaustion of administrative remedies requirements; the rule against advisory opinions; the doctrines of standing, ripeness, and mootness;

principles of waiver and forfeiture; res judicata and various other estoppel

doctrines; and statutes of limitation. The Judicial Review Clause does not confer

authority for the courts to pass upon the constitutionality of laws in cases not

properly before the courts. See St. John's Melkite Catholic Church v. Commr.

of Revenue, 240 Ga. 733, 734 (1) (242 SE2d 108) (1978) ("We will not decide

the constitutionality of a law where no justiciable case or controversy is

presented."). It does not, therefore, conflict in any way with the doctrine of

sovereign immunity.[23] See Goolsby v. Regents of the Univ. System of Ga., 141

Ga. App. 605, 609 (4) (234 SE2d 165) (1977) ("The doctrine of sovereign

immunity is not a bar to the enforcement of constitutional rights; it merely

operates to withhold from the courts jurisdiction over the person of the state,

without regard for the basis of the suit."), overruled on other grounds,

---

[23] The plaintiff-physicians urge that, if lawsuits like this one are barred by the doctrine of sovereign immunity, there is little left of judicial review. But judicial review does not inevitably require that the State be hauled into court. Aside from cases that run up against the bar of sovereign immunity, the courts may have occasion to address the constitutionality of statutes in cases between private parties, cases against the State in which sovereign immunity has been waived, cases brought by the State, and cases against state officers in their individual capacities. Indeed, many constitutional guarantees specifically protect the rights of criminal defendants, and it always has been understood that those guarantees most commonly (and in some instances, exclusively) will be asserted defensively in criminal prosecutions. The doctrine of sovereign immunity leaves plenty of room for the exercise of judicial review.

<u>Donaldson</u>, 262 Ga. at 53 (3), and <u>Deal v. Coleman</u>, 294 Ga. 170, 177 (2) (a) (751 SE2d 337) (2013).

### C.

Finally, the plaintiff-physicians make a structural argument of sorts, proceeding from the premise that, if sovereign immunity bars suits like this one, the courts will be left powerless to safeguard (prospectively, at least) the constitutional rights of citizens. If that were the case, they say, the Executive and Legislative branches effectively would be set above the Judicial branch. And that state of affairs, they conclude, would be inconsistent with the essential and fundamental structure of our constitutional government, most especially the constitutional separation of powers, see Ga. Const. of 1983, Art. I, Sec. II, Par. III, and the related idea that each of the branches are coequal. See <u>Thompson v. Talmadge</u>, 201 Ga. 867, 874 (1) (41 SE2d 883) (1947). We are not sure that the conclusion follows from the premise — after all, Article I, Section II, Paragraph IX is as much a part of the Constitution of 1983 as any of its other provisions, and sovereign immunity is, therefore, itself a part of the essential and fundamental structure of our constitutional government. But we need not dwell

long on whether the conclusion follows the premise, inasmuch as the premise itself is a false one.

In the first place, there are a number of ways in which an aggrieved citizen may pursue claims directly against state departments, agencies, and officers in their official capacities for relief from official acts alleged to be unconstitutional or otherwise unlawful, notwithstanding the broad sweep of sovereign immunity. The most prominent of these is a suit under the Tort Claims Act, which waives sovereign immunity for suits to recover monetary damages for "the torts of state officers and employees while acting within the scope of their official duties or employment," OCGA § 50-21-23 (a), subject to a number of exceptions, see OCGA § 50-21-24, and limitations. See, e.g., OCGA § 50-21-29 (b). In addition, the Administrative Procedure Act expressly permits declaratory judgments to determine "[t]he validity of any rule, waiver, or variance . . . when it is alleged that the rule, waiver, or variance or its threatened application interferes with or impairs the legal rights of the petitioner." OCGA § 50-13-10 (a). See also Black v. Bland Farms, LLC, 332 Ga. App. 653, 659 (1) (774 SE2d 722) (2015). The Administrative Procedure Act likewise explicitly authorizes judicial review of final agency decisions in contested cases. See OCGA § 50-13-

19 (a). A variety of claims related to the assessment and collection of state taxes may be asserted by petition to the state tax tribunal, see OCGA § 50-13A-9, and final judgments of the tax tribunal are generally subject to judicial review. See OCGA § 50-13A-17 (b). And as we have held, sovereign immunity is no bar to petitions for writs of mandamus. See SJN Properties, 296 Ga. at 799 (2) (b) (ii). These are but a few examples.

Moreover, as we have explained at some length, the doctrine of sovereign immunity usually poses no bar to suits in which state officers are sued in their individual capacities for official acts that are alleged to be unconstitutional. That was the general rule at common law, as well illustrated by decisions like Dennison, 156 Ga. at 796-798, Holcombe, 188 Ga. at 363-364, and Undercofler, 221 Ga. at 829 (1), among others. Inasmuch as Article I, Section II, Paragraph IX of the Constitution of 1983 requires that sovereign immunity apply today just as it applied at common law, Dennison and its progeny retain their vitality (at least as to the question of sovereign immunity), only now as a matter of constitutional law. Indeed, these settled precedents were the basis for our concluding statements in Sustainable Coast and Olvera, in which we gave assurance that our decisions "d[id] not mean that citizens aggrieved by the

50

unlawful conduct of public officers are without recourse. It means only that they must seek relief against such officers in their individual capacities." Sustainable Coast, 294 Ga. at 603. See also Olvera, 298 Ga. at 428.

To this point, the plaintiff-physicians worry that, even if *sovereign* immunity is no bar to suits against state officers, *official* immunity commonly is a bar to such suits. The defendant-state officers agree, urging that the doctrine of official immunity ordinarily would bar a suit against state officers in their individual capacities for official acts involving an element of discretion, including their enforcement of laws alleged to be unconstitutional.[24] As to retrospective relief — monetary damages and other relief for wrongs already done and injuries already sustained — they are, generally speaking, right. But the plaintiff-physicians did not seek retrospective relief, and here, we are concerned instead with prospective relief — relief from the threat of wrongful acts and injuries yet to come — especially in the form of injunctions and declaratory judgments. As we explain below, official immunity generally is no

_____

[24] Following oral argument, we asked the parties to brief the extent to which official immunity would bar a suit like this one (if it were brought against state officers in their individual capacities). We also invited amici curiae to file a brief on this question. The briefing in this case has been most helpful, and the Court appreciates the work of the seasoned counsel representing the various parties and amici.

bar to claims against state officers in their individual capacities for injunctive and declaratory relief from the enforcement of laws that are alleged to be unconstitutional, so long as the injunctive and declaratory relief is only prospective in nature.[25]

Like sovereign immunity, the doctrine of official immunity is one that has been recognized in Georgia for many years. As it did throughout the United States, the doctrine developed in Georgia through decisional law, at least in the beginning. See Gilbert, 264 Ga. at 752 (6) (explaining origins of official immunity in Georgia). See also Merrow v. Hawkins, 266 Ga. 390, 392 (2) n.4 (467 SE2d 336) (1996) (noting that official immunity "developed primarily through case law"). As the doctrine traditionally was understood by Georgia courts, it provided that, "[i]n matters of ministerial duty[,] [public officers] may even be liable for nonfeasance as well as misfeasance, for mistakes and neglects[,] but in matters of judgment and discretion[,] they are liable only if they act wilfully, corruptly, or maliciously." Price v. Owen, 67 Ga. App. 58, 60-

---

[25] We address only the doctrine of official immunity that applies to suits against state officers and employees generally. Special doctrines of immunity may apply in suits against particular state officers and employees, but we do not address, for instance, judicial immunity, legislative immunity, or prosecutorial immunity.

61 (19 SE2d 529) (1942) (citations and punctuation omitted). See also Gilbert, 264 Ga. at 752 (6) ("The doctrine of official immunity . . . provides that while a public officer or employee may be personally liable for his negligent ministerial acts, he may not be held liable for his discretionary acts unless such acts are wilful, wanton, or outside the scope of his authority." (Citations omitted)); Nelson v. Spalding County, 249 Ga. 334, 337 (2) (b) (290 SE2d 915) (1982) ("Although a public officer is liable for damages to those injured by his omissions in performing ministerial duties, he is only liable for errors in the exercise of discretionary duties if his acts are wilful, malicious, or corrupt." (Citation omitted)); Vickers v. Motte, 109 Ga. App. 615, 617 (137 SE2d 77) (1964) ("It is the general rule that public officers, when acting in good faith and within the scope of their duty, are not liable to private action. This immunity is not extended to them when they do things not authorized by law, or act in a wanton or malicious way and with intent to injure the property of another." (Emphasis omitted)). This traditional understanding of the doctrine is reflected as well in Gormley v. State of Ga., 54 Ga. App. 843, 847-848 (189 SE 288) (1936), which involved a suit against the state superintendent of banks upon his bond for monetary damages:

As a general rule the failure of a public officer to comply with the laws governing and regulating his powers and duties usually subjects such officer to a civil action for damages. It is a well-established principle that a public officer who fails to perform purely ministerial duties required by law is subject to an action for damages by one who is injured by his omission. However, it is equally well established that where an officer is invested with discretion and is empowered to exercise his judgment in matters brought before him . . . he is usually given immunity from liability to persons who may be injured as the result of an erroneous decision; provided the acts complained of are done within the scope of the officer's authority, and without wilfulness, malice, or corruption.

(Citations and punctuation omitted). See also Partain v. Maddox, 131 Ga. App. 778, 781-782 (206 SE2d 618) (1974) (discussing Gormley).

In developing the doctrine, the courts saw it as a practical one, essential to the encouragement of good government. As our Court of Appeals put it in Price, if an honest mistake would expose a public officer to personal financial ruin, it "would . . . be difficult to get responsible men to fill public office." 67 Ga. App. at 60 (citations and punctuation omitted). There also was a concern that, if public officers were too exposed to liability for monetary damages, they might be too timid in exercising their lawful discretion for the public good, and their official decisions might become compromised, quite understandably, by

54

their personal interest in avoiding liability. See id. ("[But for official immunity,] there would be constant temptation to yield officially to unlawful demands, lest private liability be asserted and enforced." (Citations and punctuation omitted)). See also <u>Gilbert</u>, 264 Ga. at 750 (4) ("[I]t has been a recognition of the need of preserving independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits." (Citation and punctuation omitted)).

Given the purpose of the doctrine as a matter of decisional law, it is unsurprising that it appears to have been limited to cases in which a public officer was sued in his individual capacity for monetary damages or other retrospective relief. As this Court explained in <u>Koehler v. Massell</u>, 229 Ga. 359, 366-367 (191 SE2d 830) (1972), a case involving a suit against the mayor and aldermen of Atlanta in their individual capacities for allegedly making an unlawful use of municipal funds and their amenability to injunctive and monetary relief, a claim against a public officer personally for prospective injunctive relief is of an entirely different character from a claim against him personally for monetary damages:

> That a taxpayer, for himself and others, may sue in equity . . . for an injunction to restrain the officers of a municipal corporation from contracting an

55

indebtedness in excess of the constitutional limit, has been held repeatedly. We need not cite cases. They are familiar to all. But where a debt has been created notwithstanding the limitation, may the city officials who by their official acts have knowingly and wrongfully brought about such result be held personally liable for the amount of such debt[?] . . . While a violation of the Constitution in the respect in question is to be condemned, and the courts should interfere to prevent such violation whenever called upon to do so, yet we are not prepared to adopt the suggestion that an action for damages may be resorted to, as affording a proper means of redress, where a violation has been accomplished. . . . There is a vast difference between a proceeding to restrain the officers of a municipality from appropriating more of its funds to a particular purpose than could be legally done, and an action at law brought by a citizen and taxpayer of the municipality, for its use, to recover from such officers a large sum of money . . . .

(Citations and punctuation omitted.) This understanding is consistent with the understanding in American law generally that the personal immunities of public officers typically do not extend to prospective relief. See 63C AmJur2d Public Officers and Employees § 379 ("Immunity from damages does not ordinarily bar equitable relief."). See also Wood v. Strickland, 420 U. S. 308, 314 (II) n.6 (95 SCt 992, 43 LE2d 214) (1975) (qualified immunity under 42 USC § 1983 "does not ordinarily bar equitable relief"); Morse v. Frederick, 551 U. S. 393,

432 (127 SCt 2618, 168 LE2d 290) (2007) (Breyer, J., concurring in part and dissenting in part) ("A qualified immunity defense applies in respect to damages actions, but not to injunctive relief." (Citation and punctuation omitted)).

Official immunity, however, did not survive forever simply as a doctrine of decisional law. Following the original adoption of the Constitution of 1983, the doctrine of official immunity was caught up in some of the same tort cases involving the purchase of liability insurance that we previously discussed with reference to sovereign immunity. See Division II (B) supra. In Martin, for instance, this Court held that the purchase of liability insurance for employees of a state department not only waived the sovereign immunity of the department itself, but also waived the official immunity of those employees in their individual capacities, citing a case involving the waiver of *sovereign* immunity. See 257 Ga. at 303 (2) (citing DeKalb County School Dist. v. Bowden, 177 Ga. App. 296 (339 SE2d 356) (1985)). The Court so held notwithstanding that the insurance in question was purchased under a 1977 statute that authorized the provision of insurance or indemnity for state officers and employees only "to the extent that they are not immune from liability against personal liability[ ] for damages arising out of the performance of their duties or in any way connected

57

therewith." 257 Ga. at 301-302 (citation, punctuation and emphasis omitted). See also Ga. L. 1977, p. 1051, § 1. Likewise, in Swofford v. Cooper, 184 Ga. App. 50, 54-55 (5) (360 SE2d 624) (1987), a majority of the Court of Appeals held that the official immunity of a staff psychiatrist at Georgia Regional Hospital was waived in a medical malpractice case because the psychiatrist was insured. In dissent, Judge Beasley noted that the provisions of the Constitution of 1983 as originally adopted concerning waiver by the purchase of liability insurance were about *sovereign* immunity, not *official* immunity, and she criticized the decisional law under the Constitution of 1983 as improperly conflating and confusing these distinct doctrines. See 184 Ga. App. at 57-58 (Beasley, J., dissenting).

Commentators observed other worrisome trends with respect to official immunity in the tort decisions that followed the adoption of the Constitution of 1983. Some of the cases, according to Professor Sentell, confused the distinction between ministerial and discretionary functions. See R. Perry Sentell, Jr., *Official Immunity in Local Government Law: A Quantifiable Confrontation*, 22 Ga. St. U. L. Rev. 597, 599 (I) (2006) ("The appellate courts struck and re-struck this ministerial-discretionary balance with a confusing vengeance [in the

1980s]." (Citing R. Perry Sentell, Jr., *Individual Liability in Georgia Local Government Law: The Haunting Hiatus of Hennessy*, 40 Mercer L. Rev. 27, 35 (1988))). Another commentator worried that the appellate courts had watered down official immunity with respect to discretionary functions, noting that several of the cases involving discretionary functions had spoken in terms of ordinary negligence, not willfulness or malice. See Martha Baum Sikes, *The Fall and Rise of Official Immunity*, 25 Ga. St. Bar J. 93, 96-98 (Nov. 1988).

Against this background, when the General Assembly in 1990 proposed to revise Article I, Section II, Paragraph IX with respect to sovereign immunity, it also proposed to add a new provision that would recognize constitutionally the doctrine of official immunity. Enacted as a part of the 1991 amendment of the Constitution of 1983, Article I, Section II, Paragraph IX (d) provides:

> Except as specifically provided by the General Assembly in a State Tort Claims Act, all officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions. Except as provided in this subparagraph, officers and employees of the state or its departments or agencies shall not be

subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions. The provisions of this subparagraph shall not be waived.

Article I, Section II, Paragraph IX (d) as amended in 1991 is the first — and so far, the only — constitutional reference to the doctrine of official immunity in our history. That provision, however, does not simply refer to a preexisting doctrine of official immunity. Unlike the other provisions of Article I, Section II, Paragraph IX that address sovereign immunity without defining it, the constitutional provision for official immunity affirmatively lays down a rule of official immunity. We cannot say, therefore, that the text of the constitutional official immunity provision unambiguously signals an incorporation of the whole of the decisional law concerning official immunity that predated the 1991 amendment.

This noteworthy textual characteristic of Article I, Section II, Paragraph IX (d) forms the basis for the arguments of the defendant-state officers that constitutional official immunity bars any suit against state officers in their individual capacities for injunctive and declaratory relief from the threat of official action that is alleged to be unconstitutional. According to the defendant-

state officers, the 1991 amendment swept away the doctrine of official immunity that had developed in our decisional law, and it replaced that doctrine with something else. As to the scope of that something else, the defendant-state officers rely almost entirely upon the second sentence of Article I, Section II, Paragraph IX (d) as amended in 1991. They note that it speaks in absolute terms, providing that state officers "shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d) (as amended in 1991). Citing dictionary definitions, the defendant-state officers argue that a suit for injunctive or declaratory relief is a "suit," and citing a canon of statutory construction, they argue that things that an officer may someday decide to do or not do are "the performance or nonperformance of their official functions," as those terms are used in Article I, Section II, Paragraph IX (d). Consequently, they conclude, the constitutional doctrine of official immunity would bar a suit against a state officer in his individual capacity for injunctive or declaratory relief from the threat of official acts that would allegedly violate the Constitution. We are unpersuaded.

To begin, we recall that, when we consider the meaning of a constitutional provision, we must seek to ascertain the way in which the text most reasonably would have been understood at the time of its adoption, reading it "as an ordinary speaker of the English language would." Georgia Motor Trucking Assn., 301 Ga. at 356 (2) (citation and punctuation omitted). Consequently, we do not read a single sentence of a constitutional provision in isolation. To the contrary, we read it together with the other sentences of the same provision, with the other provisions of the Constitution that address the same or related subjects, and with the extant law — constitutional, statutory, and common law — that formed the legal background of the provision at the time of its adoption. See Tibbles, 297 Ga. at 558. We also must read the provision "in the light of conditions existing at the time of [its] adoption." Clarke, 199 Ga. at 166 (citation and punctuation omitted). Although the second sentence of Article I, Section II, Paragraph IX (d) might be susceptible — if read in isolation — of being fairly understood in the way that the defendant-state officers urge, important context indicates otherwise.

First, although the text of Article I, Section II, Paragraph IX (d) does not unambiguously incorporate all of the preexisting decisional law on official

immunity, it also does not unambiguously sweep that law into the dustbin of historical curiosities. As we have explained, when the 1991 amendment was adopted, there was a substantial body of decisional law on official immunity. That decisional law differentiated between ministerial and discretionary functions of public officers, permitted suits for monetary damages against public officers in their individual capacities for negligence with respect to the performance of their ministerial functions, and limited suits for monetary damages against public officers in their individual capacities with respect to their discretionary functions to cases in which the officer acted willfully, maliciously, or corruptly. See generally Price, 67 Ga. App. at 60-61. The first sentence of Article I, Section II, Paragraph IX (d) looks a lot like that body of extant decisional law. It likewise distinguishes between ministerial and discretionary functions, providing that state officers

> may be subject to suit and may be liable for injuries and damages
> caused by the negligent performance of, or negligent failure to
> perform, their ministerial functions and may be liable for injuries

63

and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.

Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d) (as amended in 1991). As we have noted, the constitutional official immunity provision is "consistent with prior law." Cameron, 274 Ga. at 124-125. Even if the Constitution of 1983 as amended does not provide for the wholesale incorporation of preexisting decisional law on official immunity, that decisional law nevertheless provides important context for a proper understanding of Article I, Section II, Paragraph IX (d). See generally Morissette v. United States, 342 U. S. 246, 263 (72 SCt 240, 96 LE 288) (1952) ("[W]here [the People or the legislature] borrow[ ] terms of art in which are accumulated the legal tradition and meaning of centuries of practice, [they] presumably know[ ] and adopt[ ] the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."). That decisional law, of course, does not suggest that official immunity ever had been understood to apply to claims for prospective relief.

Reading the second sentence of Article I, Section II, Paragraph IX (d) in connection with its first suggests not only that the preexisting decisional law may still provide some useful guidance, but it indicates more directly that the entirety of the constitutional official immunity provision is about suits for monetary damages, most commonly tort suits. The first sentence is explicitly and entirely about retrospective relief — it identifies the circumstances in which a public officer may be personally liable for "injuries and damages," that is, injuries and damages already inflicted.[26] What's more, it uses the term "suit" in reference to a "suit . . . for injuries and damages," and it uses the phrase "performance of their official functions" in reference to a performance of official functions that has "caused" injuries and damages, that is, a past performance. Although "suit" often refers broadly to any sort of legal proceeding,[27] and although "performance or nonperformance of their official

---

[26] We note as well that the first sentence directs that the General Assembly may provide otherwise in a State *Tort* Claims Act.

[27] See Black's Law Dictionary at 1448 (7th ed. 1999) (defining "suit" broadly as "[a]ny proceeding by a party or parties against another in a court of law"). Although that is the principal definition of the term, it has a broad range of other meanings, some of which are limited to suits at law, some of which are limited to suits in equity, and some of which refer more generally to civil suits of all sorts. See id. See also Bryan A. Garner, Garner's Dictionary of Legal Usage 862-863 (3rd ed. 2011); Black's Law Dictionary at 1663 (10th ed. 2014).

functions" sometimes might include a performance or nonperformance yet to come,[28] the usage of these terms and phrases in the first sentence of Article I, Section II, Paragraph IX (d) suggests strongly that the terms and phrases are more reasonably understood in the second sentence to be used in the more limited sense in which they are used in the first sentence. Indeed, when the same words are used in different parts of a single constitutional or statutory enactment, the courts generally assume — absent some clear indication otherwise — that the words are used in the same sense. See <u>Sullivan v. Stroop</u>, 496 U. S. 478, 484 (110 SCt 2499, 110 LE2d 438) (1990). See also <u>Allen v. Donaldson</u>, 12 Ga. 332, 335 (1852) ("[T]he same term or phraseology occurring in the same Statute, is to receive the same interpretation, unless there be something in the Act which renders this construction manifestly improper.").

Other contextual clues suggest that the second sentence of Article I, Section II, Paragraph IX (d) is about suits for retrospective relief. The second sentence uses the term "liability" alongside "suit." A "liability" often refers to

---

[28] As noted by amici, "performance" sometimes may refer to "'the execution of an action,' without a limitation as to time," and it sometimes may refer "more specifically to 'something accomplished,' as in a previously completed task." (Supplemental Br. of Amici Curiae The Southern Center for Human Rights et al. at 4 (citing dictionaries)).

"[a] financial or pecuniary obligation," that is, monetary damages, Black's Law Dictionary at 925 (7th ed. 1999), and that usage is consistent with the first sentence, which speaks of public officers being "liable for injuries and damages."[29] Moreover, as we have explained, the adoption of the official immunity provision in 1991 — and indeed, the adoption of the entirety of the 1991 amendment, including the provisions on sovereign immunity — appears to have been largely in response to a number of controversial developments in *tort* law following the adoption of the provision for the waiver of sovereign immunity in the original Constitution of 1983.[30] Finally, the General Assembly adopted a Tort Claims Act at its 1992 Session, only a year after the adoption of the 1991 amendment. In the Tort Claims Act, the General Assembly expanded

---

[29] The second sentence also provides that "no judgment shall be entered against [public officers] for the performance or nonperformance of their official functions," except as provided in Article I, Section II, Paragraph IX (d). This provision likewise indicates that the second sentence is not to be taken in its broadest possible sense. If "judgment" were taken in its broadest sense, it arguably would mean that criminal prosecutions of public officers for misfeasance in office, see, e.g., OCGA § 16-10-1 (violation of oath of office), would be barred by the Constitution of 1983 as amended. A criminal conviction is, after all, a "judgment" in the broadest sense.

[30] We do not mean to suggest that any prior decision of this Court or our Court of Appeals was incorrectly decided. We mean only that they generated controversy, as explained in this opinion.

official immunity for state officers and employees in tort cases,[31] see Ga. L. 1992, p. 1883, § 1 (enacting OCGA § 50-21-25 (a)), and importantly for our purposes, in doing so, it explained its understanding of the reasons for official immunity:

> The General Assembly also recognizes that the proper functioning of state government requires that state officers and employees be free to act and to make decisions, in good faith, *without fear of thereby exposing themselves to lawsuits and without fear of the loss of their personal assets*. Consequently, it is declared to be the public policy of this state that state officers and employees shall not be subject to lawsuit or liability arising from the performance or nonperformance of their official duties or functions.

Ga. L. 1992, p. 1883, § 1 (enacting OCGA § 50-21-21 (b)) (emphasis added). As we explained in DeKalb County School Dist. v. State Bd. of Education, 294 Ga. 349, 355 (1) (a) n.12 (751 SE2d 827) (2013), "[c]ourts long have acknowledged that, when a legislature enacts a statute that touches upon a constitutional provision close in time to the adoption of that constitutional

---

[31] Official immunity under the Tort Claims Act is cast in seemingly broader terms than official immunity under the Constitution: "A state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to lawsuit or liability therefor." OCGA § 50-21-25 (a). See also Davis v. Standifer, 275 Ga. App. 769, 771 (1) (a) (621 SE2d 852) (2005) (noting breadth of official immunity under Tort Claims Act).

provision, the statute is powerful evidence of the contemporary understanding of the constitutional provision." See also Marsh v. Chambers, 463 U. S. 783, 790 (II) (103 SCt 3330, 77 LE2d 1019) (1983).

Read in its proper context, Article I, Section II, Paragraph IX (d) is most reasonably understood to be about suits and liabilities for retrospective relief, mostly monetary damages in tort cases. To read it otherwise, one would have to assign different meanings to the same words in consecutive sentences of that provision; one would have to ignore all of the historical context and conclude that the 1991 amendment really was not mostly about tort cases; and one would have to understand the 1991 amendment to have swept away decades of case law that permitted suits against public officers in their individual capacities for injunctive and declaratory relief from the threat of official acts that would violate the Constitution, even without any mention of injunctions and declaratory judgments in the text of the amendment. Finally, we should add, the defendant-state officers have not cited a single case in which this Court, our Court of Appeals, or any other court has applied the doctrine of official immunity (or a doctrine like it) to bar a suit for injunctive or declaratory relief. We conclude that Article I, Section II, Paragraph IX (d) concerns suits and

liabilities of public officers for monetary damages and other retrospective relief. It does not limit the availability of prospective relief. Accordingly, the plaintiff-physicians need not worry any longer that official immunity would bar a suit like this one, if only it were brought against state officials in their individual capacities.[32]

## IV.

The constitutional doctrine of sovereign immunity bars any suit against the State to which it has not given its consent, including suits against state departments, agencies, and officers in their official capacities, and including

---

[32] The plaintiff-physicians also argue that a suit against state officers in their individual capacities would not be as convenient as a suit against the State itself. That may be true, but if so, that is simply a cost of sovereign immunity, albeit one that the General Assembly could eliminate by enacting a statutory waiver of sovereign immunity for suits like this one. In particular, the plaintiff-physicians worry that an injunction or declaratory judgment against a state officer in his individual capacity might not run to his successor in office or other state officers. Perhaps that is true, although we need not decide it to resolve this case. We nonetheless note that injunctions run by operation of law not only to the parties, but also to "their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive notice of the order by personal service or otherwise." OCGA § 9-11-65 (d). We also note that, to the extent that a successor in office is not directly bound by a judgment, he may be bound effectively by the principle of res judicata. Finally, to the extent that a suit against a state officer in his individual capacity leads to the issuance of a binding precedent by an appellate court, there is a longstanding presumption in the law (absent evidence to the contrary) that state officers will abide by the law. See McDowell v. Judges Ex Officio, 235 Ga. 364, 365 (219 SE2d 713) (1975) ("The law presumes [that] public officers will follow the law in the exercise of their statutory duties and authority." (Citation omitted.)).

suits for injunctive and declaratory relief from the enforcement of allegedly unconstitutional laws. If the consent of the State is to be found, it must be found in the Constitution itself or the statutory law. We find no consent that would permit this suit against the Governor and nineteen other state officers in their official capacities, and the trial court, therefore, did not err when it dismissed the suit. There are, however, prospective remedies that the plaintiff-physicians may pursue against state officers in their individual capacities.

Judgment affirmed. Hines, C. J., Melton, P. J., Benham, Nahmias, Boggs, JJ., and Judge Penny Haas Freesemann and Judge Ann B. Harris concur. Hunstein, J., concurs in Divisions I, II, III (A), III (C), IV and in the judgment. Peterson and Grant, JJ., disqualified.

Decided June 19, 2017.

Sovereign immunity; constitutional question. Fulton Superior Court. Before Judge Adams.

Garland, Samuel & Loeb, Donald F. Samuel; Alexa Kolbi-Molinas, Susan T. Camp, for appellants.

Christopher M. Carr, Attorney General, Dennis R. Dunn, Deputy Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Victoria C. Powell, Assistant Attorney General, Sarah H. Warren, Solicitor-General, for appellees.

Bondurant Mixson & Elmore, Ronan P. Doherty, Manoj S. Varghese, Michael R. Baumrind, amici curiae.