**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 17, 2025**

# In the Court of Appeals of Georgia

A25A0120. CITY OF ATLANTA et al. v. BLOCK, INC. OF DELAWARE.

HODGES, Judge.

Block, Inc., a company whose businesses include the payment systems Square and CashApp, sued the City of Atlanta (the "City"), its mayor, its chief financial officer,[1] and the Atlanta City Council, seeking a partial refund of the business occupation taxes it had paid for tax years 2016, 2017, and 2018, and arguing that the amount of taxes was wrongly calculated. Block then moved for summary judgment, while the City moved to dismiss Block's complaint, arguing that the trial court lacked jurisdiction because of sovereign immunity. In a combined order, the trial court granted Block's motion for summary judgment and denied the City's motion to

---

[1] Block later voluntarily dismissed the chief financial officer from the suit.

dismiss. The City appealed. For the reasons that follow, we conclude that the trial court had jurisdiction to consider the issues presented, and we affirm the grant of summary judgment to Block.

The record shows that for the tax years 2016-2018, Block generated more than $235 million in gross receipts from Georgia customers. Following an audit, in 2019, the City assessed an additional occupation tax of nearly $330,000 on those receipts. In 2022, Block paid approximately $540,000 — the tax, plus penalties and interest — under protest.

Block filed the present lawsuit, which it later amended, seeking a partial tax refund pursuant to OCGA § 48-5-380, which provides that a municipality must refund to taxpayers any taxes that were collected erroneously or illegally. Block contends that because it operated multiple out-of-state locations[2] that contributed to its gross revenue in Georgia in the years at issue,[3] pursuant to a State statute that provides

---

[2] Block had multiple offices during the time in question. It had 15, 20, and 28 offices in the United States in tax years 2016, 2017, and 2018, respectively, including a single Georgia office at all relevant times.

[3] Block's director of income tax compliance, David Thai, stated in a sworn affidavit that "Block had many locations or offices in the United States during the [y]ears at [i]ssue. Each of these offices contributed to Block's business and its generation of revenue." Thai also averred that "[n]o revenue was generated directly

mathematical tax calculation methods (OCGA § 48-13-14) and a similar local ordinance (Atlanta Code § 30-80), the taxable gross receipts should be allocated on a percentage basis, with the total number of offices, including out-of-state locations contributing to Georgia revenue, used as the divisor and the Georgia gross receipts as the dividend.[4] Block then moved for summary judgment, arguing, inter alia, that its Georgia gross receipts should be divided among all of its locations nationwide that contributed to the generation of those receipts. The trial court held a hearing, but two days later, before the court ruled, the City moved to dismiss, arguing that the court lacked jurisdiction due to sovereign immunity because Block sought declaratory relief but failed to satisfy the "exclusivity" requirement of Ga. Const. of 1983, Art. I, Sec. II, Para. V (b) (2).

---

from the Atlanta office. The Atlanta office did not contribute to Block's receipts from Georgia customers in any measurable way more than Block's offices outside of Georgia did."

[4] As the trial court aptly put it, "in a world of easy math — if Block reported a total of $1,000 in gross receipts to local governments in Georgia and a network of five locations around the country contributed to generating those receipts, the City would be able to levy an occupation tax on $200 in gross receipts ($1,000 [divided by] 5 locations = $200 per location)."

The trial court denied the City's motion to dismiss and granted Block's motion for summary judgment. In denying the motion to dismiss, the court found that Block was not seeking declaratory relief, but rather was simply claiming a tax refund. In granting Block's motion for summary judgment, the court found that Block's gross receipts generated in Georgia could not be reasonably allocated among its offices nationwide, and that Block's occupation tax should be calculated based on its Georgia gross receipts divided by the number of Block offices nationwide pursuant to OCGA § 48-13-14 (a) (2) in each tax year, rather than divided by Block's sole Georgia office. The parties do not dispute that OCGA § 48-13-14 (a) (2) applies, nor do they dispute the amount of Block's gross receipts in Georgia. Based on this methodology, the trial court ordered that nearly $520,000 plus interest be refunded to Block, finding that the total additional occupation tax Block actually owed was just more than $20,100. The City appealed.

1. The City first contends that the trial court should have dismissed Block's lawsuit for lack of jurisdiction on sovereign immunity grounds because Block was seeking declaratory relief and failed to satisfy the "exclusivity" requirement of Ga.

Const. of 1983, Art. I, Sec. II, Para. V (b) (2), which provides that only a municipality may be sued in this context. We find no error.

Sovereign immunity is jurisdictional. *Sons of Confederate Veterans v. Newton County Bd. of Commrs.*, 368 Ga. App. 511, 512-513 (890 SE2d 468) (2023). Lawsuits brought against a city which are barred by sovereign immunity are subject to OCGA § 9-11-12 (b) (1) dismissal for lack of subject-matter jurisdiction. See *Sons of Confederate Veterans*, 368 Ga. App. at 513; Ga. Const. of 1983, Art. IX, Sec. II, Para. IX (authorizing waiver of sovereign immunity for municipalities).

"We review a trial court's ruling on a motion to dismiss based on sovereign immunity de novo because it is a matter of law. Of course, the trial court's factual findings will be sustained if there is evidence to support them, and the party seeking the waiver of immunity has the burden of proof." (Citations omitted.) *Gwinnett County v. Ashby*, 354 Ga. App. 863, 864 (842 SE2d 70) (2020).

The Georgia Constitution expressly waives sovereign immunity "for actions in the superior court seeking declaratory relief from acts of [a] . . . municipality of this state. . . ." Ga. Const. of 1983, Art. I, Sec. II, Para. V (b) (1). It also provides, however, that actions against a municipality "shall be brought exclusively against such . . .

5

municipality and in the name of such . . . municipality. Actions filed pursuant to this Paragraph naming as a defendant any individual, officer, or entity other than as expressly authorized under this Paragraph shall be dismissed." Ga. Const. of 1983, Art. I, Sec. II, Para. V (b) (2).

As noted above, Block's amended complaint named the City, the Atlanta City Council, and the Atlanta mayor as party defendants. As a result, the City argues that the complaint must be dismissed. See *Lovell v. Raffensperger*, 318 Ga. 48, 50-53 (2) (b) (897 SE2d 440) (2024) (requiring dismissal pursuant to Paragraph V even where State actors were named in their official capacities); *State v. SASS Group*, 315 Ga. 893, 904 (II) (d) (885 SE2d 761) (2023) (finding that "if a lawsuit is filed against the State pursuant to Paragraph V and that suit includes an independent claim against another party not specified in that paragraph's waiver provision, then the entire lawsuit must be dismissed" where district attorney was an additional, unauthorized, named defendant).

The question before us, then, is whether Block's action is actually one for declaratory relief such that Paragraph V requires dismissal. See *SASS Group*, 315 Ga. at 904 (noting that "[b]ecause their claims against the State for declaratory . . . relief

required Paragraph V's waiver of sovereign immunity, Plaintiffs filed this lawsuit against the Defendants pursuant to Paragraph V").

Block's complaint states that this is "a direct action for refund" under OCGA § 48-5-380. As the City points out, however, Block's prayer for relief also asks the trial court to "declare that the City is not authorized by law to impose its occupation tax on gross receipts from sales or services performed and allocated outside of a location within the City[.]"[5] The City argues that this indicates a declaratory action under the sovereign immunity waiver provisions of Paragraph V subject to dismissal for failure to comply with Paragraph V's exclusivity provisions.

In the trial court, Block argued that this was solely a refund action seeking recoupment of taxes it had already paid, that it was an as-applied rather than facial challenge to OCGA § 48-5-380, and that the lawsuit was not filed pursuant to Paragraph V, but rather pursuant to the sovereign immunity waiver provisions incorporated into OCGA § 48-5-380. See *Hojeij Branded Foods v. Clayton County*, 355 Ga. App. 222, 224 (843 SE2d 902) (2020) (finding that "OCGA § 48-5-380 is the

---

[5] We note that Block's arguments have changed over time. On appeal, it does not contest the trial court's finding that occupation taxes may be assessed on Georgia, rather than City, gross receipts.

statute under which taxpayers may seek refunds from taxes paid to counties and municipalities. The statutory authorization to bring an action for a tax refund in superior court against a county or city is an express waiver of sovereign immunity, and the county's or city's consent to be sued for a tax refund must be strictly construed") (citation and punctuation omitted); accord *Coleman v. Glynn County*, 344 Ga. App. 545, 549 (2) (809 SE2d 383) (2018).

While our Supreme Court has indicated that dismissal is required even where a claim is based only "partially" on Paragraph V's waiver of sovereign immunity, *Lovell*, 318 Ga. at 50-53 (2) (b), nothing indicates that Block's action sought declaratory relief, even in part. See OCGA § 9-4-1 (providing that the purpose of the declaratory judgment chapter "is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations"). As Block argues, "declare" appears once in the complaint and can be used interchangeably with "determine" or "decide" or "rule." Further, Block's action focused on clawing back taxes it had already paid rather than seeking a resolution of uncertainty or prospective relief related to its future conduct, which are hallmarks of a declaratory action. See OCGA § 9-4-1; *Lathrop v. Deal*, 301 Ga. 408, 434 (III) (c) (801 SE2d 867) (2017)

(finding that a request for declaratory relief is a request for "prospective relief—relief from the threat of wrongful acts and injuries yet to come"). This was not a declaratory action. See *Publix-Lucas Theaters v. City of Brunswick*, 206 Ga. 206, 208 (1) (56 SE2d 254) (1949) (finding that declaratory relief was unavailable where a full and complete remedy existed for a refund of the tax already paid); *A&H Sod v. Johnson*, 279 Ga. App. 252, 253 (630 SE2d 851) (2006) (providing that where a taxpayer has "already paid the taxes for the years in question, an action for declaratory judgment, which necessarily looks to the future, will not lie"). The trial court had jurisdiction.

2. The City next argues that the trial court erred in granting summary judgment to Block by finding that OCGA § 48-13-14 (a) (2) required the City to divide Block's Georgia gross receipts reported to local Georgia governments by all Block locations nationwide that contributed to generating those Georgia gross receipts, rather than attributing all of the Georgia gross receipts to Block's single Georgia location. We find no error.

> Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. We review a trial court's summary judgment ruling de

novo, construing the evidence and all reasonable inferences favorably to the nonmovant.

(Citation and punctuation omitted.) *Cotton Pickin' Fairs v. Town of Gay*, 346 Ga. App. 327 (816 SE2d 160) (2018).

OCGA § 48-13-6 (b) authorizes municipal corporations to provide for the assessment and collection of occupation taxes such as those at issue here from "occupations which have one or more locations or offices within the corporate limits" of the municipality. The starting point for assessing occupational taxes is assessing gross receipts, which are the "total revenue of the business" for the taxable period at issue generated from sales to customers within the State of Georgia. OCGA § 48-13-5 (2) (A); Atlanta Code § 30-51 (1). This definition expressly excludes "[p]roceeds from sales of goods or services which are delivered to or received by customers who are outside the state at the time of delivery or receipt." OCGA § 48-13-5 (2) (B) (vi); accord Atlanta Code § 30-51 (2) (f).

OCGA § 48-13-14 (a) (1) and (2) offer alternate methods for calculating the occupation tax liability. The City assessed Block's occupation taxes under OCGA § 48-13-14 (a) (2), and the trial court found that OCGA § 48-13-14 (a) (2) indeed applied

because Block's gross receipts could not be allocated by location or office. Neither party challenges this on appeal, so our analysis is based upon OCGA § 48-13-14 (a) (2), which provides:

> (a) In levying occupation tax upon a business or practitioner with a location or office situated in more than one jurisdiction, including businesses or practitioners with one or more locations or offices in Georgia and one or more locations outside the state, local governments which use the criterion described in paragraph (3) of subsection (a) of Code Section 48-13-10 [discussing tax on gross receipts] shall allocate the gross receipts as defined in paragraph (2) of Code Section 48-13-5 [discussing total Georgia revenue] of the business or practitioner for occupation tax purposes in accordance with . . . the following method[]: . . .
>
> (2) Where the business or practitioner cannot reasonably allocate the dollar amount of gross receipts among multiple locations or offices, the business or practitioner shall divide the gross receipts reported to all local governments in this state by the number of locations or offices of the business or practitioner which contributed to the gross receipts reported to any local government in this state, and shall allocate an equal percentage of such gross receipts of the business or practitioner to each location or office.

On appeal, the City challenges the trial court's finding that in calculating the amount of taxes owed, Block's Georgia gross receipts should be divided by the total number of Block offices contributing to those receipts nationwide — rather than by Block's lone Georgia office. The City argues that the trial court misinterpreted OCGA § 48-13-14 (a) (2)'s "contributed to" language. It contends that because the gross receipts considered must, by law, exclude "[p]roceeds from sales of goods or services which are delivered to or received by customers who are outside the state[,]" OCGA § 48-13-5 (2) (B) (vi), the "gross receipts reported to any local government in this state" per OCGA § 48-13-14 (a) (2) means that only Block's Georgia office – not its 14 to 27 *other* offices (depending on the year) nationwide can be deemed to have "contributed to" its reported Georgia gross receipts. The upshot of the City's argument, which advocates changing the divisor from a total of 15 to 28 offices depending on the year at issue to a divisor of 1 — for Block's sole Atlanta office — is, obviously, that Block would owe more taxes to the City. Block counters that OCGA § 48-13-14 (a) (2) "does not limit the denominator [that is, the number of office locations] based on whether the locations or offices are in Georgia." Indeed, as Block points out and as we discuss further in Division 3, it is undisputed, and the City

12

conceded, that all of Block's United States offices contributed to its Georgia gross receipts.

> Because the . . . arguments on appeal involve the meaning of the statute, the threshold issue is whether the language is plain and unequivocal, in which case judicial construction is not permitted, or whether it is ambiguous, in which case judicial construction is appropriate. A statute is ambiguous when it is susceptible of more than one natural and reasonable interpretation.

(Citation omitted.) *Fulton County Bd. of Tax Assessors v. Greenfield Investment Group*, 313 Ga. App. 195, 197-198 (721 SE2d 128) (2011).

> [W]e necessarily begin our analysis with familiar and binding canons of construction. In considering the meaning of a statute, our charge as an appellate court is to presume that the General Assembly meant what it said and said what it meant. Toward that end, we must afford the statutory text its plain and ordinary meaning, consider the text contextually, read the text in its most natural and reasonable way, as an ordinary speaker of the English language would, and seek to avoid a construction that makes some language mere surplusage.

(Citation omitted.) *Jones v. City of Atlanta*, 360 Ga. App. 152, 154 (860 SE2d 833) (2021). We do not examine the statute's text in isolation. See *Plummer v. Plummer*, 305 Ga. 23, 26 (2) (823 SE2d 258) (2019). "For context, we may look to the other

provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question." (Citation and punctuation omitted.) Id. at 27 (2).

We conclude that the text of OCGA § 48-13-14, while not necessarily straightforward, is nonetheless unambiguous.[6] Block argues that OCGA § 48-13-14 (a)'s introductory language, which provides, "[i]n levying occupation tax upon a business or practitioner with a location or office situated in more than one jurisdiction, *including businesses or practitioners with one or more locations or offices in Georgia and one or more locations outside the state*[,]" specifically contemplates the division of Georgia gross receipts among contributing out-of-state offices. (Emphasis supplied.) We agree.

OCGA § 48-13-14 (a) (2) clearly provides that a business with both Georgia and out-of-state offices, which may be subject to taxation by out-of-state jurisdictions, is not exempt from *Georgia* taxation — while also providing that the division of *Georgia*

---

[6] As the trial court noted, "the language of the Georgia allocation statute (and Atlanta's parallel ordinance) is admittedly convoluted[.]" However, "[a] statute or regulation is not ambiguous merely because interpreting it is hard. After using all tools of construction, there are few statutes or regulations that are truly ambiguous." (Citation omitted.) *City of Guyton v. Barrow*, 305 Ga. 799, 803-804 (2) (828 SE2d 366) (2019).

gross receipts as reported to local governments is accomplished only by using as the divisor the number of the business's offices contributing to the generation of those receipts.[7] Specifically, OCGA § 48-13-14 (a) (2) directs that businesses "*shall divide the gross receipts reported to all local governments in this state by the number of locations or offices of the business or practitioner which contributed to the gross receipts* reported to any local government in this state," with those receipts being allocated via an equal percentage between each contributing office. (Emphasis supplied.) The statute's plain language in no way limits the number of offices contributing to Georgia

---

[7] The legislative history of this statute is not particularly enlightening, but does indicate that the State has been wrestling with how to address the issue of multi-locale or multi-state businesses for some time. The 1993 legislative history for OCGA § 48-13-14 notes that the statute was, at that time, being amended "to authorize counties and municipal corporations *to classify and tax businesses* . . . located in a single jurisdiction or *more than one jurisdiction* and certain businesses and practitioners *with no location in the state*[.]" (Emphasis supplied.) Ga. L. 1993, p. 1292, § 7. The 1995 legislative history provides that its purpose is "to revise extensively provisions relating to occupation taxes . . .; to provide that certain . . . *proceeds from sales to customers outside the state shall not be gross receipts*[.]" (Emphasis supplied.) Ga. L.1995, p. 419, § 1. The legislative history for 1999, the year in which the statute took on its present form, noted only that (i) the purpose of the amendment was "to change provisions relating to occupation tax on a business or practitioner with an office or location in more than one jurisdiction[,]" (ii) OCGA § 48-13-14, "relating to businesses or practitioners with locations or offices in more than one jurisdiction" was stricken "in its entirety[,]" and (iii) the text of the current law should be inserted in place of the old law. Ga. L. 1999, pp. 749, 753, § 5.

gross revenue to offices located within the State of Georgia. To read the statute to exclude out-of-state locations, as the City advocates, would require us to read limiting language into the statute that the legislature did not provide. "We will not read into the statute language that the General Assembly did not include. We must presume that the General Assembly 'meant what it said and said what it meant.'" *City of Suwanee v. Padgett*, 364 Ga. App. 34, 36 (2) (873 SE2d 712) (2022), citing *Deal v. Coleman*, 294 Ga. 170, 712 (1) (a) (751 SE2d 337) (2013). Such a reading also would require us to find OCGA § 48-13-14 (a)'s "one or more locations outside the state" language to be mere surplusage, which we may not do. *Jones*, 360 Ga. App. at 154.

Although neither party argues in its appellate brief about the specter of double taxation from other, out-of-state jurisdictions, we note that other parts of the statute specifically contemplate — and offer potential ways to account for — that issue. OCGA § 48-13-14 (d) and (e) contemplate that businesses "with a location or office situated *in more than one jurisdiction*" may be asked to provide the City with information relating to how " other local governments" allocate gross receipts and use taxation criteria. (Emphasis supplied.) Neither "jurisdiction" nor "local government" is defined in the statute in terms of whether the statute is referencing

in-state or out-of-state entities or both, but given OCGA § 48-13-14 (a)'s reference to businesses with "one or more locations or offices in Georgia and one or more locations *outside the state*," a plain reading of OCGA § 48-13-14 (d) and (e) would logically account for out-of-state offices as being included in other jurisdictions. (Emphasis supplied.)

Atlanta Code § 30-80 is similarly structured. It provides for the "[a]llocation of gross receipts of business[es] *with multiple intrastate or interstate locations*[,]" and further provides that "[w]here the dollar amount of gross receipts attributed locally cannot be determined in those businesses with multiple locations, the total gross receipts will be divided by the total number of locations *in the city and elsewhere* and allotted to those locations." (Emphasis supplied.) Atlanta Code § 30-80 is likewise unambiguous for the same reasons discussed in connection with OCGA § 48-13-14. Although the term "elsewhere" is undefined in the Atlanta Code, again, to read the Atlanta Code as the City would wish would require us to add language that excludes out-of-state locales, which we may not do. *Padgett*, 364 Ga. App. at 36 (2); *Deal*, 294 Ga. at 712 (1) (a). Further, this limited reading would require us to render meaningless

and mere surplusage the language specifically referencing "interstate locations." *Jones*, 360 Ga. App. at 154.

In sum, we find that the trial court correctly determined that the statute's plain language provides that Block's Georgia gross receipts, as reported to the local taxing authority, be divided by the number of its offices — including out-of-state offices — contributing to those Georgia gross receipts. Because we may neither render meaningless language in the statute, nor add language it does not contain, this is the only permissible reading of the statute.

> Courts may construe statutes to avoid absurd results; however, under our system of separation of powers[, c]ourts do not have the authority to rewrite statutes. . . . The doctrine of separation of powers is an immutable constitutional principle which must be strictly enforced. Under that doctrine, statutory construction belongs to the courts, legislation to the legislature. *We can not add a line to the law*.

(Citations and punctuation omitted; emphasis supplied.) *Catoosa County v. Rome News Media*, 349 Ga. App. 123, 134, n. 52 (825 SE2d 507) (2019). The trial court did not err.

3. The City also argues that the trial court misapplied the summary judgment standard because it relied on the uncontroverted affidavit of Block's director of income tax compliance, David Thai, who provided evidence about Block's business

18

structure and averred that each of its offices contributed to Georgia revenue that it reported to the local taxing authority. The City's contention is meritless.

Although the City concedes that "Thai's affidavit was the only evidence in the record about those issues[,]" it insists that there are material issues of fact, but does not identify them. It also notes that "Thai's credibility is at the heart of this dispute[,]" and cites, inter alia, *Harding v. Georgia Gen. Ins. Co.*, 224 Ga. App. 22, 25 (a) (479 SE2d 410) (1996), for the proposition that, on motion for summary judgment, if "the credibility of a witness . . . upon whose testimony the grant of the summary judgment depends is at issue in the case, neither the trial court nor this court will resolve the matter or is concerned with the credibility but will leave this matter to the jury[.]" The City, however, fails to present any argument about why Thai's credibility may be at issue, nor does it address the fact that *Harding* involved an assessment of the witness's state of mind in the face of "extensive impeachment evidence that contradict[ed the witness's] testimony . . . ." Id. at 24 (a). Here, the City presented no evidence — impeachment or otherwise — contradicting Thai's affidavit. Nor does it argue that the trial court failed to view any evidence or inferences in the light most favorable to the City. Instead, the City asks us to find that the trial court should have

19

disbelieved Thai's uncontroverted testimony. This we may not legally do. See *Smith v. Tibbits*, 359 Ga. App. 362, 372 (2), n. 32 (857 SE2d 820) (2021) (finding that "on summary judgment, neither [this Court] nor the lower court may consider the credibility of witnesses").

Our Code provides that to defeat a summary judgment motion, the City, as the adverse party,

> *may not rest upon the mere allegations or denials of [its] pleading*, but [its] response, by affidavits or as otherwise provided in this Code section, *must set forth specific facts showing that there is a genuine issue for trial*. If [it] does not so respond, summary judgment, if appropriate, shall be entered against [it].

(Emphasis supplied.) OCGA § 9-11-56 (e). The City failed to come forward with such evidence. In fact, as referenced in Division 2, the City conceded the following in its response to Block's statement of material facts to which there is no genuine issue to be tried:

> Block had many locations or offices in the United States during the [y]ears at [i]ssue. Each of these offices contributed to Block's business and its generation of revenue.

20

**RESPONSE: The [c]ourt may properly consider this undisputed fact in ruling on summary judgment.**

(Bold in original.)

For the foregoing reasons, we find no error, and we affirm the grant of summary judgment to Block.

*Judgment affirmed. McFadden, P. J., and Pipkin, J., concur.*

21